# UNITED STATES DISTRICT COURT
## FOR THE
## MIDDLE DISTRICT OF NORTH CAROLINA

ANDREW GIULIANI,

        Plaintiff,

   v.

DUKE UNIVERSITY and ORRIN
DANIEL VINCENT, III.

        Defendants.

Civil Action No. 1:08—cv—00502

## COMPLAINT
## JURY TRIAL DEMANDED

## NATURE OF THE ACTION

Andrew Giuliani brings this action to obtain a declaration from this Court that Duke University must keep the promises that it makes to induce its students to enroll; and, further, that in all of its dealings with its students, the University is bound to the same law of contract and the same covenant of good faith and fair dealing that every party to a contract in North Carolina is bound. Specifically, this action is brought because:

It is wrongful for a coach to secretly expel a student from a team, in violation of numerous University policies enacted to protect the student.

It is wrongful for a coach to secretly expel a student from a team without notice, without an opportunity to defend himself, and without cause.

It is wrongful for a coach, by threat of expulsion, to attempt to coerce a student into waiving rights guaranteed to him.

It is wrongful for a coach to retaliate against a student who refuses to waive his rights to fairness and basic due process.

It is wrongful for the University's lawyers to shut down an Athletic Director's investigation of a student grievance, to conduct a sham investigation, to prevent a student from meeting with his Athletic Director, to insist that a student pursue a "grievance procedure," and then to vitiate that procedure by publishing false and misleading findings and concluions based on their "investigation."

It is wrongful for a coach to set teammates against one another and then delegate to team members the power to expel a teammate who competes with them for limited places on the roster.

Amazingly, Duke University insists that none of these acts is wrongful and that each one is, instead, within its "significant authority." The purpose of this suit is to establish what common sense and basic morals plainly dictate: each of the acts described above and detailed within is wrongful and must be stopped.

## THE PARTIES

1.    **PLAINTIFF ANDREW GIULIANI** is a rising senior, enrolled as a student in good standing at Duke University.  Andrew is, and at all times relevant to this action, was a citizen and resident of New York.

2.    **DEFENDANT DUKE UNIVERSITY** is an educational institution formed under the laws of North Carolina, with its primary place of business in Durham, North Carolina. In furtherance of its educational mission, Duke established an Athletic Department, which operates 26 NCAA Division I teams, including a men's golf team.

3.    **DEFENDANT ORRIN DANIEL "O.D." VINCENT, III,** is, and beginning in the summer of 2007, was the Head Coach of the Duke University Men's Golf Team.  At all relevant times, O.D. Vincent reported directly to Associate Athletics Director Michael Sobb.  O.D. Vincent is, and at all times relevant to this action, was a citizen and resident of North Carolina.

## PARTIES NOT PRESENTLY NAMED IN THE ACTION

4.    RYAN RESSA is, and beginning in the summer of 2007 was, O.D. Vincent's Assistant Coach.

5.    MICHAEL SOBB is, and at all times relevant to this action was, an Associate Athletics Director with supervisory authority over O.D. Vincent and the Golf Program.

6.    PAMELA BERNARD is, and at all times relevant to this action was, Duke University's Senior Vice President and General Counsel.  In that capacity, Bernard is a University officer with policymaking authority over interpretation of documents purporting to establish the procedures, rights, and responsibilities of the University with respect to its students.

7.     MICHAEL QUAGLIANO is, and at all times relevant to this action was, a member of the Duke University Men's Golf Team.

8.     ADAM LONG is, and at all times relevant to this action was, a member of the Duke University Men's Golf Team.

9.     MATTHEW PIERCE is, and at all times relevant to this action was, a member of the Duke University Men's Golf Team.

## JURISDICTION & VENUE

10.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332, because there is complete diversity in the citizenship of parties, and the amount in controversy, without interest and costs, exceeds the sum or value specified by 28 U.S.C. § 1332.  Venue is proper in the Middle District of North Carolina pursuant to 28 U.S.C. § 1391(b)(1), (2), and (3), because all of the Defendants reside or may be found in the Middle District of North Carolina, and a substantial portion of the events that give rise to this action took place in the Middle District of North Carolina.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

### A.     DUKE UNIVERSITY MADE PROMISES TO ANDREW TO INDUCE HIM TO CHOOSE DUKE OVER MANY OTHER SCHOOLS THAT SOUGHT HIM.

11.    A little more than four years ago, when Andrew was a junior in high school, the late Rod Myers was the Head Coach of Duke University's Men's Golf Team.  Coach Myers and his assistant coach, Jim Kubinski, both aggressively recruited Andrew to Duke.

12.    When Coach Myers was recruiting Andrew, Coach Myers knew that it was Andrew's dream to become a professional golfer after college.  Coach Myers knew well

the long odds of making it to the professional tour, but he also knew of Andrew's talent, accomplishments, and strong work ethic.  Coach Myers knew about the thousands of hours Andrew had already spent practicing and improving, and he encouraged Andrew to continue.  Coach Myers also knew that Andrew was going to select the university that would provide him with the best preparation to achieve his dream.

13.  In light of that, Coach Myers focused Andrew's attention on the University's "state-of-the-art" training facilities which were "second to none" and were for the exclusive use of the men's and women's golf teams.  In addition, Coach Myers repeatedly emphasized to Andrew that he would be given life-time access to those training facilities as an alumnus of the Duke Golf Program.  Further, Coach Myers assured Andrew that, if he matriculated to Duke, he would have the opportunity to compete with his teammates to earn spots in the most competitive tournaments against the most talented players in the NCAA.

14.  These inducements were material to Andrew's decision to enroll in Duke University.  Andrew decided to accept Duke University's offer to enroll based in material part upon the promises that the University made to him through Coach Myers. Until his untimely passing in the Spring of 2007, Head Coach Myers kept the promises that he made to Andrew on behalf of the University.  Things changed when O.D. Vincent took over.

**B.  DUKE UNIVERSITY AND ANDREW ALSO ENTERED INTO A $200,000 CONTRACT.**

15.  Upon his enrollment at Duke University, Andrew and Duke University entered into an agreement.  The Agreement required Andrew to pay Duke University roughly $200,000 in tuition and fees and by definition required him to forego numerous opportunities at other colleges and universities that compete with Duke for top student-athletes.  In exchange, the University promised to provide Andrew with various

educational services, lodging, and a right of access to the Athletic Department's Varsity program and facilities.

16.    The Agreement between Duke University and Andrew is memorialized in several documents that govern the dimensions of the relationship between Andrew and the University.  Collectively, these documents will be referred to herein as "the Contract."

### C.    O.D. VINCENT ILLEGALLY CANCELLED ANDREW'S ELIGIBILITY TO PARTICIPATE IN THE ATHLETIC PROGRAM WITHOUT NOTICE, HEARING, OR CAUSE.

17.    When O.D. Vincent took over the program, the team had 13 players.  O.D. Vincent wanted to make it smaller, about half the size it was.  The goal of a smaller squad was discussed by O.D. Vincent with members of the Athletic Department at the time he was hired as the late Coach Myers' replacement; the players were not given any choice in the matter.

18.    On February 11, 2008, O.D. Vincent announced to the team that he was unilaterally cancelling Andrew's eligibility to participate in the University's Athletics Program immediately and indefinitely.   Andrew and his teammates were shocked. Andrew had no prior notice of what was about to happen.  At no time was Andrew ever given an opportunity to defend himself; instead he was summarily dismissed.

19.    None of the events O.D. Vincent cited involved conduct that potentially authorized suspension under the Contract, and certainly not expulsion from the team. Further, most of the alleged conduct occurred in a two day period.   The allegations were:

- On February 2, 2008 Andrew flipped his putter a few feet to his golf bag; on February 3, 2008 Andrew leaned on his driver and it broke; in O.D. Vincent's telling, this became "throwing and breaking" a club.

- On February 3, 2008 Andrew walked ahead of his playing partner, Chance Pipitone, at Treyburn Golf Course; O.D. Vincent later admitted that he had instructed players to do this to help other players increase their pace of play.

- The same day, Andrew "gunned" the engine of his car and drove fast while leaving the golf course parking lot.

- On February 4, 2008, during a football game that was part of the team's training session, Andrew played harder than some of the other boys wanted to play.

- Andrew was allegedly disrespectful to a trainer sometime in October, 2007, although no trainer has ever said so to Andrew.

- On February 10, 2008, after a teammate, Brian Kim, twice hit Andrew's hand knocking an apple to the ground and slammed a door hitting Andrew's face, Andrew tossed the apple at the teammate, glancing off the side of his face.

20.    As will be demonstrated here and at trial, the foregoing "charges" were a fabricated and insufficient excuse O.D. Vincent employed to cut the Gordian knot that the Contract imposed on his rush to shrink the size of the Men's Golf Team.

### D.    O.D. VINCENT IMPOSED A BIZARRE, "LORD OF THE FLIES" SCHEME TO DETERMINE WHETHER ANDREW'S ELIGIBILITY WOULD BE CANCELLED PERMANENTLY.

21.    O.D. Vincent then created—from whole cloth—unique requirements for Andrew's reinstatement.   Specifically, Andrew's suspension would become a permanent cancellation of his athletic eligibility at Duke unless every single one of his twelve teammates wrote a letter to O.D. Vincent that O.D. Vincent deemed "satisfactory" supporting Andrew's reinstatement to the team and explaining the reasons why.  If even one member declined, and no reason was required, Andrew was permanently expelled.

22.     All of this took place at a time when O.D. Vincent was increasing the pressure on the players through a forced shrinkage of the roster.  The termination of Andrew's eligibility would mean less competition for the few spots available.


**E.      O.D. VINCENT'S "INDEFINITE SUSPENSION" WAS IN FACT AN ILLEGAL AND SECRET CANCELLATION OF ANDREW'S ATHLETIC ELIGIBILITY.**

23.     What O.D. Vincent called an indefinite suspension was, in fact and in effect, the termination of Andrew's eligibility to participate in the University's intercollegiate athletic program, including its facilities.

24.     O.D. Vincent's conduct breached multiple provisions of the Contract, including, for example:

a)      O.D. Vincent breached the Contract because the Contract does not give him the power to unilaterally cancel Andrew's eligibility;

b)      O.D. Vincent breached the Contract by cancelling Andrew's eligibility when Andrew had not engaged in any of the specific conduct enumerated in the Contract as sufficient cause for cancelling a student-athlete's eligibility;

c)      O.D. Vincent breached the Contract by refusing to consult with the Director of Athletics prior to cancelling Andrew's eligibility—in fact, he kept it a closely guarded secret—when the Contract requires all coaches to do so prior to taking any adverse action against a student-athlete;

d)      O.D. Vincent breached the Contract because he refused to give Andrew any prior notice of the allegations he used to justify his cancellation;

e)      O.D. Vincent breached the Contract because he refused to give Andrew an opportunity to respond to his allegations, disprove them, or to simply be heard before imposing the suspension—in violation of the Contract's due process provisions and procedural safeguards; and

f)      O.D. Vincent breached the Contract by delegating to Andrew's teammates the power to terminate Andrew's eligibility, because (1) the Contract does not authorize O.D. Vincent to delegate such authority to anyone, and (2) the Contract does not give O.D. Vincent power to unilaterally cancel Andrew's eligibility under any circumstance.

25.     O.D. Vincent was well aware that Andrew has been the subject of significant media interest throughout his life, and that news of O.D. Vincent's wrongful conduct could cause Andrew to be unjustly subjected to harsh public scrutiny.   O.D. Vincent's deliberate misconduct evinces his malicious intent to deprive Andrew of his rights under the Contract, to injure Andrew's reputation in his chosen profession, and to subject Andrew to public scrutiny and humiliation.   Knowing all of the foregoing was occurring, University Senior Vice President and General Counsel Pamela Bernard condoned and ratified O.D. Vincent's misconduct, evincing her own callous disregard and/or deliberate indifference to the bad faith violations of Andrew's rights under the Contract.   Because Bernard is a University official with final policymaking authority with respect to the Contract, her callous disregard and/or deliberate indifference to Andrew's rights is imputed to Duke University.

26.     Under the duress of O.D. Vincent's unfounded accusations and unjustified
cancellation of his eligibility, Andrew determined not to quibble with the details of O.D.
Vincent's false and petty allegations; instead, Andrew accepted responsibility for any
hurt feelings he may have caused among his teammates and asked for their forgiveness
and support in returning to the team.

27.     That same night, February 11, 2008, Andrew's teammate, Brian Kim wrote a long
email supporting Andrew's immediate reinstatement to the team.  Kim wrote that he was
in a "rage" after his exchange of words with Andrew the day before, that he did not mean
the things he said, that Andrew was a "great guy," and that he did not think Andrew
should be suspended.  O.D. Vincent wrote back that Brian's email did not qualify as a
letter supporting Andrew's reinstatement.

28.     Andrew personally met with each of the nine returning team members at least two
times each over the subsequent weeks.  Eight of the nine expressly assured Andrew that
they supported Andrew's return to the team.  Several complimented, as they had
previously many times, Andrew's work ethic and dedication to the team.

29.     In March, one of Andrew's teammates who had expressed shock at the surprise
suspension, Clark Klaasen, told O.D. Vincent that he wanted to take a leadership role in
Andrew's reinstatement to the team.  O.D. Vincent instructed Klaasen to back off, and
warned Klaasen to "focus on his golf game."

30.     O.D. Vincent instructed Klaasen and his teammates not to write their letters until
they "heard more from Andrew."  At the same time, unbeknownst to the team members,
O.D. Vincent instructed Andrew to "back off" and limit his contacts with his teammates.
For example, Andrew told O.D. Vincent that he had made plans to drive himself to the
tournament the team would play in beginning March 23, so that he could support his
teammates as a spectator. O.D. Vincent directed Andrew not to go. Upon information

and belief, Andrew's teammates did not know he had made plans to travel to their tournament during the suspension to cheer for them, or that he did not do so only because O.D. Vincent directed him not to do so.

31. Contemporaneously with Andrew's efforts to win support for his reinstatement from his teammates, O.D. Vincent was instilling new fears in his teammates that their positions on next year's roster were also in jeopardy. Among other things, O.D. Vincent began implementing his plan to drastically cut the size of the team roster through a qualifier that would and did eliminate several players.

32. It was plainly obvious to each team member that their own personal interests were directly in conflict with Andrew's reinstatement to the team. They feared that O.D. Vincent could unilaterally dismiss them from the team without warning or notice.

### G. AFTER WILLFULLY VIOLATING ANDREW'S CONTRACT RIGHTS, O.D. VINCENT TRIED TO COERCE ANDREW TO SIGN A WAIVER OF THOSE SAME RIGHTS.

33. O.D. Vincent originally advised the team that those who participated as a member of the Varsity team in a tournament in 2007-2008 were exempt from O.D.Vincent's "qualifier"; i.e., the individual would not be required to "re-qualify" to maintain his status as a member of the Duke Men's Golf Team for 2008-2009. Andrew was one of the team members who qualified through Varsity tournament play.

34. Nevertheless, in late March, O.D. Vincent summoned Andrew to his office. There, O.D. Vincent told Andrew that he would have to participate in the qualifier in order to have a spot on next year's team roster (but only if, in addition, Andrew's teammates all wrote "satisfactory" letters supporting his return). O.D. Vincent told Andrew that if Andrew agreed to certain "parameters" O.D. Vincent would draw up, then Andrew would not be required to participate in the qualifier.

35. Andrew immediately objected to O.D. Vincent's scheme, stating the truth that O.D. Vincent ignored: Andrew had already qualified for the 2008-09 team, having

played as a member of the Varsity team in two tournaments in the fall in Illinois and Georgia.  Undeterred, O.D. Vincent still pursued his efforts to coerce Andrew into agreeing to "parameters."

36.     The "parameters" O.D. Vincent had in mind were presented to Andrew in a written agreement prepared by Vincent ("O.D. Vincent's Waiver Agreement"). Remarkably, O.D. Vincent's Waiver Agreement actually commits to writing much of the bizarre manipulation that O.D. Vincent had engaged in since February 11, 2007, and is annexed as **EXHIBIT 1.**

37.     O.D. Vincent characterized the document as an agreement, and styled it as such.  It contained two signature lines, one each for O.D. Vincent and Andrew.

### H.     ANDREW DID NOT SIGN THE WAIVER AGREEMENT THAT WOULD FORCE HIM TO GIVE UP HIS RIGHTS AND WOULD CLOAK O.D. VINCENT'S BIZARRE SCHEME IN SECRECY.

38.     O.D. Vincent's Waiver Agreement was designed to obtain Andrew's release of his rights under the Contract and place a lid of secrecy on the sordid scheme.   O.D. Vincent presented his Waiver Agreement to Andrew on two separate occasions.  Andrew refused to sign it both times.

39.     First, on April 2, 2008, O.D. Vincent presented his document to Andrew for his signature in the presence of Andrew's step-father, Ed Oster, and Associate Athletic Director Michael Sobb.  At the meeting, Sobb was present in his capacity as a University officer, director, or manager with supervisory authority over O.D. Vincent and policymaking authority with respect to the University's compliance with its obligations under the Contract.

40.     At that meeting, O.D. Vincent advised Andrew that his Waiver Agreement was "not a legal document."   In fact, however, O.D. Vincent's Waiver Agreement would constitute Andrew's express waiver of his rights under the Contract and the procedural safeguards that O.D. Vincent had already violated multiple times.

41.     O.D. Vincent's Waiver Agreement's "secrecy" provisions evinced O.D. Vincent's malicious intent and deliberate indifference to Andrew's rights.  The secrecy provisions were also Vincent's transparent effort to avoid being caught violating the Contract.  The most notable of them was that Andrew was prohibited from knowing anything at all about what his teammates wrote to the coaches or vice versa, or even who had written; only O.D. Vincent would know.  For example, O.D. Vincent's Waiver Agreement stated:

> "All correspondence between players and coaches regarding this topic will be kept anonymous and confidential. … [A] status report on how many 'approvals' have been received is acceptable, a question as to who has or has not written is unacceptable."

42.     Andrew reviewed the document and did not sign it.  This took place in the presence of O.D. Vincent, Sobb, and Andrew's step-father, Ed Oster, who is a practicing attorney.  After Mr. Oster left North Carolina, O.D. Vincent called Andrew to his office alone.  Again, O.D. Vincent presented Andrew the document and demanded that Andrew sign it.  When Andrew refused to sign it, O.D. Vincent stated "that's a bad decision." O.D. Vincent made clear what he meant in short order.

**I.     AFTER ANDREW DID NOT SIGN O.D VINCENT'S WAIVER AGREEMENT FOR THE SECOND TIME, O.D. VINCENT RETALIATED AGAINST ANDREW BY EXPELLING HIM.**

43.     Following Andrew's second refusal to sign O.D. Vincent's Waiver Agreement, O.D. Vincent retaliated against Andrew by orchestrating a sequence of acts, including, for example:

a)          The very next day, Andrew's teammate, Michael Quagliano, wrote Andrew an email, on behalf of himself and four of the other team members mentioned in O. D. Vincent's Waiver Agreement, notifying Andrew that they had decided that Andrew's membership on the team should be terminated.  In

the weeks prior to that, all but one of them had expressed their support for his return to the team.  The e-mail is annexed as **EXHIBIT 2.**

b)      An anonymous notice was placed on Andrew's vehicle stating that his parking privileges at the Athletic Department's facilities were revoked, and his car would be towed if he parked there again.  The Parking Notice is annexed as **EXHIBIT 3**.

c)      O.D. Vincent's assistant coach Ryan Ressa sent an email to the University golf course's pro shop stating, "Andrew Giuliani has been removed from the Duke Varsity golf team.  We would appreciate if you could take him off the official list of players who is [sic] allowed to play and practice for free." Ressa's e-mail is annexed as **EXHIBIT 4**.

44.     All of the foregoing occurred without O.D. Vincent contacting Andrew to tell him that he had terminated Andrew's eligibility; instead, O.D. Vincent hid behind the returning team members and the pro shop staff.

### J.      UNIVERSITY LAWYERS POISONED THE GRIEVANCE PROCESS, AND THEN INSISTED THAT ANDREW SUBJECT HIMSELF TO IT AS HIS ONLY REMEDY.

45.     After his athletic eligibility was terminated, Andrew sought a meeting with the Interim Athletic Director, Dr. Christopher Kennedy.  Kennedy initiated an investigation of the matter, meeting with six team members as a group and separately with Andrew for approximately ten minutes.

46.     Kennedy notified O.D. Vincent that he wanted to have a further meeting alone with Andrew and his teammates—coaches excluded—to learn more about the situation. O.D. Vincent then met with the returning team members, notified them of Kennedy's intention, and directed them to confront Andrew publicly, which they did that same day,

in a public area near O.D. Vincent's office, where they harassed and attempted to intimidate Andrew.

47.     After that, O.D. Vincent contacted Kennedy to insist that no meeting among the returning team members and Andrew was necessary.

48.     Shortly thereafter, Kennedy's investigation was shut down by Pamela Bernard, the University's General Counsel.  Bernard declared that the Counsel's office would conduct its own investigation into the matter, and demanded that all communication relating to this matter be directed to her.  In response, Andrew's counsel delivered a letter to Bernard that detailed the facts as alleged herein, annexed relevant documents, and requested a meeting.

49.     Bernard delegated the responsibility for investigating O.D. Vincent's misconduct to Deputy General Counsel, Kate Hendricks.  At the time, and throughout her investigation, Ms. Hendricks was in Mississippi, on extended leave from her duties.  The Hendricks' investigation was a sham.

50.     Ms. Hendricks promised Andrew's counsel personally that she would meet with Andrew as part of the investigation.  Ms. Hendricks never met with or spoke with Andrew at all.

51.     At the conclusion of Hendricks' "investigation," and knowing that Andrew's mother and step-father had requested a meeting with Provost Peter Lange, Ms. Bernard issued an uninvited and unannounced opinion letter based ostensibly on the Hendricks' investigation ("Bernard's Opinion").  Bernard's Opinion ignored numerous positive letters from other individuals, including student-athletes at Duke, describing Andrew's interaction with other students, and attesting to Andrew's good sportsmanship and good character.  None of these individuals was interviewed.  Nevertheless, Bernard's Opinion, issued on behalf of the University, purports to declare the facts of the matter and establish the University's legal conclusions with respect to Andrew's rights under the Contract.

52.     Bernard's Opinion claimed that O.D. Vincent's bizarre conduct and his unilateral termination of Andrew's eligibility was "within the significant authority of the coach." In the same breath, Bernard insisted that Andrew's only option was to pursue a grievance procedure conducted by an administrator who must defer to Bernard on such questions.

53.     At every turn, Bernard's Opinion is oblivious to its own most obvious consequence:  the Opinion unequivocally declares the University's position on all issues that were to be adjudicated in any meaningful grievance procedure.

54.     Bernard's Opinion thereby vitiated any meaningful administrative remedy that theoretically could have been available to Andrew in the grievance procedure she directed Andrew to pursue.

> **K.     THROUGH THIS ACTION, ANDREW NOT ONLY SEEKS TO VINDICATE HIS RIGHTS BUT ALSO THOSE OF HIS FELLOW STUDENTS, SO THAT DUKE UNIVERSITY MAY NO LONGER INSIST THAT ITS STUDENTS DO NOT ENJOY THE SAME BASIC RIGHTS OF CONTRACT THAT ARE SHARED  BY EVERY OTHER CITIZEN WHO ENTERS INTO A CONTRACT IN THIS STATE.**

55.     Since Andrew's exclusion from the University Athletics Department's program and facilities, Andrew has been barred from practicing at the University's state-of-the-art training facilities.  Further, because he was a competitor in three NCAA tournaments in the 2007-2008 season, he is disqualified from obtaining a Waiver from the NCAA for his junior year.  Andrew cannot recover the lost period of NCAA eligibility during the period beginning on February 11, 2008, until the end of the 2007-2008 season to compete in NCAA tournaments.

56.     Andrew has exhausted all viable sources of relief within the University.  He has been thwarted in every effort, most recently by the University's General Counsel, who published her findings and conclusions on the matter when she learned that a meeting with the University Provost had been scheduled to address this matter.  Andrew asks this Court to declare that Duke must keep the promises it makes to its students, who do not abandon their rights at the University gates.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### BREACH OF CONTRACT
*(Against O.D. Vincent and Duke University)*

57.     Plaintiff incorporates by reference all of the foregoing allegations as though fully set forth here.

58.     The Contract is a valid, enforceable agreement for services between Duke University and Andrew.

59.     Pursuant to the Contract, Andrew agreed to, among other things; pay Duke University well in excess of $200,000 over four years, to allow the University to use his likeness in its solicitations and advertisements, and to abide by the rules established in the Contract.    In exchange, Duke University promised to provide Andrew an array of educational services, the opportunity to participate in the University's intercollegiate golf program, and lifetime access to the University's "state-of-the-art" golf training facilities.

60.     The specific provisions of the Contract that are at issue in this action are annexed to this Complaint as **EXHIBIT 5** (the Duke University Student-Athlete Handbook, Revised May, 2007); **EXHIBIT 6** (the Duke University Athletic Department Policy Manual); **EXHIBIT 7** (the Duke University Student Bulletin); and **EXHIBIT 8** (the 2007-2008 NCAA Division I Manual (Constitution and By-Laws)).

61.     Duke University materially breached the Contract with Andrew in multiple ways, including, for example:

# I.
## CANCELLATION OF ELIGIBILITY

62. The Contract guarantees to Andrew that, while he was a student enrolled at Duke University, he would be able to participate in the University's intercollegiate golf program (the Program) and that he would have an unfettered right of access to the Program's facilities. The Contract provides that Andrew's rights of access and participation could be "cancelled" or "terminated" only upon the occurrence of specific events and conditions. For example, the Contract provides that Andrew's eligibility could be "terminated" or "cancelled" only under the following circumstances:

   a) If Andrew failed or refused to pay any portion of the more than $200,000 that the Contract requires Andrew to pay at the time and in the manner detailed in the Contract;

   b) If Andrew failed or refused to submit to a specified number of drug tests;

   c) If Andrew was charged with a serious felony (and, in that event, termination would be within the discretion of identified officials); or

   d) If Andrew was engaged in certain conduct specifically enumerated in the Contract.

63. No other conduct or circumstance justified the cancellation of Andrew's eligibility.

64. Andrew did not engage in any of the conduct specified in the Contract as a basis for termination or cancellation of his eligibility to participate in the University's intercollegiate athletic program. The University has never alleged that Andrew did engage in any such conduct.

65.    Nevertheless, O.D. Vincent unilaterally cancelled Andrew's eligibility to participate, without notice, hearing, or required cause, in violation of the Contract.

## II.
## VIOLATION OF PROCEDURES THE CONTRACT ESTABLISHED
## TO PREVENT WRONGFUL CANCELLATION OF ELIGIBILITY

66.    O.D. Vincent violated the due process rights and procedural safeguards that the Contract guaranteed to Andrew.  For example:

a)    O.D. Vincent refused to give Andrew any notice whatsoever of the allegations upon which O.D. Vincent claimed to base his suspension and subsequent cancellation of Andrew's eligibility;

b)    O.D. Vincent refused to consult with the Director of Athletics before he unilaterally suspended and before he unilaterally terminated Andrew's eligibility, in violation of, *inter alia*, the Contract, Part I, "Standards of Behavior";

c)    O.D. Vincent delegated authority to terminate Andrew's eligibility to each and every one of his teammates, in violation of, *inter alia*, the Contract, Part I:  "Standards of Behavior."

d)    In violation of the Contract's anti-harassment provisions, O.D. Vincent met with five of the returning team members and directed or encouraged them to confront Andrew in a public place, where they shouted obscenities at him, attempted to intimidate him, demanded that Andrew cease his attempt to restore his own eligibility, and warned Andrew that they would wield the power that O.D. Vincent had delegated to them to ensure that Andrew would never play competitive NCAA golf again unless he transferred to a different school.

18

67.    All of the foregoing constitute material breaches of the University's obligations under the Contract.

### III.
### O.D. VINCENT'S "LORD OF THE FLIES"
### SCHEME VIOLATED THE CONTRACT

68.    Nothing in the Contract or any University handbook, manual, or governing documents contemplates the bizarre scheme O.D. Vincent concocted for the wrongful cancellation of Andrew's eligibility.    Instead, O.D. Vincent designed the scheme himself, and executed it in secret.

69.    O.D. Vincent's scheme imposed undeserved and draconian punishments according to decisions made by students who were subject to O.D. Vincent's authority, who were in fear themselves that O.D. Vincent would single them out for the same malicious and unfounded punishments, and who stood to lose opportunities to compete in NCAA events if they "allowed" Andrew's return to compete with them for those opportunities.

70.    The Contract prohibits subjecting students to the deprivation of their rights under the Contract to biased or potentially conflicted decision makers, much less decision makers with a personal, vested interest in the decision.  The only University document that is consistent with O.D. Vincent's scheme is the library's copy of William Goulding's *The Lord of the Flies*.  O.D. Vincent's bizarre scheme violated both the spirit and the plain meaning of the Contract.

71.    The disciplinary processes codified in the Contract require notice, an opportunity to answer false accusers and false allegations with facts, a determination by neutral fact-finders, free of bias, intimidation, harassment, or any other form of obstruction or interference.  Students have the right, for example, to challenge any fact-finder who has a bias or a personal stake in the outcome of the inquiry.  That is not only an express requirement of the contract, but it is also an essential element of fundamental fairness.

72.     Furthermore, O.D. Vincent did not have the power to cancel Andrew's eligibility unilaterally; he could exercise the power only if specified facts existed and only in consultation with the Director of Athletics. Thus, his delegation of the power to cancel Andrew's eligibility to Andrew's teammates was the delegation of a power that O.D. Vincent himself did not have. Further, the Director of Athletics was never even notified of O.D. Vincent's extraordinary scheme until long after O.D. Vincent cancelled Andrew's eligibility and the returning team members "decided" to make it "final."

73.     Therefore, O.D. Vincent's delegation of the power to cancel Andrew's eligibility to Andrew's teammates was *ultra vires* and a material breach of the Contract.

************

74.     As a direct and proximate result of each of the foregoing material breaches of the Contract, O.D. Vincent cancelled and/or terminated Andrew's eligibility to participate and right of access to the University's intercollegiate athletic program and facilities, which constitutes a material breach of the Contract.

75.     O.D. Vincent engaged in the conduct alleged herein in the course and scope of his employment with Duke University. His conduct is therefore imputed to Duke University for purposes of this action.

76.     Further, the University's Senior Vice President and General Counsel, Pamela Bernard, authorized, ratified and/or condoned O.D. Vincent's material breaches of the Contract and the tortious conduct that attended those breaches. As a University officer, director, or manager having policymaking authority with respect to O.D. Vincent's conduct and the cancellation of Andrew's rights under the Contract, Bernard's conduct is imputed to the University for purposes of this action.

77.     Further, knowing that O.D. Vincent had engaged and was continuing to engage in willful or wanton, fraudulent, and malicious conduct in the course and scope of

his employment with the University, Bernard, Hendricks, and Sobb participated in, condoned, and/or ratified O.D. Vincent's wrongful conduct.

78.    As a direct and proximate result of the foregoing material breaches of the Contract, O.D. Vincent's tortious conduct, and University officials' ratification of them, Andrew has suffered and will continue to suffer economic losses, including direct and reasonably foreseeable consequential damages.

79.    Andrew is therefore entitled to recover direct and consequential compensatory damages and exemplary damages from O.D. Vincent and Duke University, jointly and severally, in an amount to be determined by a jury at trial.

## SECOND CLAIM FOR RELIEF
## BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING
*(Duke University and O.D. Vincent,*
*in his individual and official capacities)*

80.    Plaintiff incorporates by reference all of the foregoing allegations as though fully set forth here.

81.    In every contract governed by the law of the State of North Carolina, there is an implied covenant of good faith and fair dealing that neither party will do anything which injures the right of the other to receive the benefits of the agreement.

82.    The University breached the Contract's implied covenant of good faith and fair dealing when, for example:

   a)    In response to Andrew's refusal to waive his rights under the Contract, O.D. Vincent retaliated against Andrew by transforming Andrew's already wrongful suspension into a permanent cancellation of Andrew's eligibility, and/or causing Andrew's teammates to do so;

b) O.D. Vincent deliberately and maliciously obstructed the Athletic Director's investigation of Andrew's report of O.D. Vincent's abuse of authority and misconduct in his dealings with Andrew by causing Andrew's teammates to confront and harass Andrew and (through directives, threats, and/or intimidation) to uniformly make false statements and otherwise misrepresent the facts under investigation; and

c) In the absence of any legitimate means of cancelling Andrew's eligibility, O.D. Vincent concocted his bizarre scheme to do so in secret.

83. In these ways as well as those detailed in the preceding claims for relief, O.D. Vincent and Duke University, individually and in concert, engaged in conduct that injured Andrew's right to receive the benefits of the Contract.

84. As a direct and proximate result of Defendants' breaches of the Contract's implied covenant of good faith and fair dealing, Andrew has suffered and will continue to suffer economic losses, including direct and consequential damages.

85. Andrew is therefore entitled to recover direct and consequential compensatory damages from O.D. Vincent and Duke University, jointly and severally, in an amount to be determined by a jury.

### THIRD CLAIM FOR RELIEF
### TORTIOUS INTERFERENCE WITH CONTRACT
*(Against O.D. Vincent, in his individual and official capacities)*

86. Plaintiff incorporates by reference all of the foregoing allegations as though fully set forth here.

87.     The Contract is a valid contract between Andrew and Duke University which conferred upon Andrew certain contractual rights, as described in this action.

88.     Knowing the Contract existed, O.D. Vincent intentionally, maliciously, fraudulently, and without justification induced the University to cease performance of the Contract with Andrew.  O.D. Vincent's conduct evinced a conscious and intentional disregard of and indifference to Andrew's rights and a malicious intent to harm and potentially humiliate Andrew by cancelling Andrew's eligibility, expelling Andrew from the team, and thereby subjecting Andrew to intense, harsh public scrutiny.

89.     As a direct and proximate result of O.D. Vincent's wrongful conduct, Andrew has suffered actual damages, and is therefore entitled to recover from O.D. Vincent personally an award of compensatory damages in an amount to be determined by a jury at trial.

90.      Further, because O.D. Vincent was acting at all relevant times in the course and scope of his employment with Duke University, Duke University is jointly and severally liable for the same damages.

*********

91.     The tortious conduct for which O.D. Vincent is liable for damages  was  aggravated by O.D. Vincent's bad faith, fraudulent, malicious, and willful or wanton conduct, as described herein.  As such, Andrew is entitled to recover from O.D. Vincent, individually, exemplary damages in the amount that the jury determines to be sufficient to deter O.D. Vincent and other similarly situated individuals from engaging in similar misconduct in the future.

92.     Further, because Duke University officers, directors, and/or managers, including but not limited to Bernard, Hendricks, and Sobb, participated in and/or condoned O.D. Vincent's fraudulent, malicious, and/or willful or wanton conduct, Andrew is entitled to recover from Duke University exemplary damages in the amount that a jury determines

to be sufficient to deter Duke University and its officers, directors, and managers from engaging in similar misconduct in its future dealings with its students.

## FOURTH CLAIM FOR RELIEF
## PROMISSORY ESTOPPEL

*(Against Duke University)*

93.  Plaintiff incorporates by reference all of the foregoing allegations as though fully set forth here.

94.  Duke University aggressively recruited Andrew to enroll at Duke.

95.  Knowing Andrew had determined to pursue a career in professional golf, Coach Myers promoted the University's "state-of-the-art" training facilities, which he hailed as "second to none." Coach Myers promised Andrew that if he agreed to enroll at Duke, he would have a lifetime right of access to those training facilities.

96.  A reasonable person would expect that the University's promises would induce Andrew's action and forbearance.

97.  Coach Myers' promises were sincerely made. They were designed to—and did— induce Andrew to enroll at Duke and thereby forego the multitude of other opportunities available to Andrew.

98.  Duke University and O.D. Vincent have eviscerated the promises made by the late Coach Myers, and now insist that the University is not bound by the promises made by Coach Myers to induce Andrew to enroll at Duke because they claim that a coach is vested with "significant authority" to dishonor such promises.

99.  Because an obvious injustice would result from this Court's sanction of Duke's refusal to honor its promises, the Court must enforce them by declaring Duke University in breach of the Contract as described herein.

100.   As a direct and proximate result of O.D. Vincent's breach of Coach Myers' promises, Andrew has suffered past economic losses and will incur future economic losses, and harm to his reputation in his chosen profession.  As such, Andrew is entitled to an award of direct and consequential compensatory damages in an amount to be determined by a jury at trial.

## FIFTH CLAIM FOR RELIEF
## DECLARATORY RELIEF
*(Against Duke University)*

101.   Plaintiff incorporates by reference all of the foregoing allegations as though fully set forth here.

102.   An actual controversy now exists between Andrew and Duke University. Specifically, Andrew seeks a declaration from this Court that:

a)      A coach may not unilaterally and in secret cancel a student-athlete's eligibility to participate in the University's intercollegiate athletic program and facilities.

b)       A coach may not delegate to student-athletes the power – which he does not have - to cancel a competitor's eligibility.

c)       It is not "within the significant authority of a coach" to cancel a student-athlete's eligibility in retaliation against him for having refused to waive the same rights that the coach had already violated with impunity.

d)      It is not "within the significant authority of the coach" to direct student-athletes under his control to harass a student who has lodged a complaint about the coach's conduct for purposes of thwarting the investigation the student's complaint launched.

e) It is not "within the significant authority of the coach" to intimidate student-athletes who were fact witnesses in an active Athletic Department investigation for purposes of interfering with and obstructing an investigation of the coach for purposes of preventing the investigation from uncovering the truth.

f) It is wrongful for the University's General Counsel to demand that a student submit to a "grievance procedure," and, at the same time, vitiate the procedure by orchestrating its own, bogus "investigation" of the facts at issue and publishing a false and misleading report of the investigation's factual findings and legal conclusions that would be binding on those who would adjudicate the grievance.

103. Duke University's policies and practices, as alleged in this complaint, have deprived and continue to deprive Andrew of the benefit of his bargain with the University and his rights under the Contract.

104. These continuing deprivations evince a deliberate indifference and/or callous disregard of the Contract rights of Andrew, who was assured of said rights prior to enrollment and deprived of them only after he abandoned other valuable opportunities to contract with other, similarly situated universities who have not adopted the practice of callously disregarding the rights of their students.

105. Therefore, Andrew is entitled to a declaration of rights declaring that the Contract, as stated herein, is a valid and enforceable contract between Andrew and the University; that Defendants' conduct, policies, and practices, as set forth herein, constitute material breaches of the Contract, and, that those breaches give rise to an immediate cause of action against the University for damages and equitable relief.

# **PRAYER FOR RELIEF**

106.    **WHEREFORE**, to establish and declare the rights and obligations of the parties under the Contract; to redress the injuries proximately and directly caused by the Defendants' conduct; and to prevent the substantial risk of similar injury to other students enrolled in Duke University as a result of the University's policy and practice of condoning the misconduct alleged herein, Plaintiff hereby requests the following relief:

1.    The issuance of a Declaratory Judgment establishing that the conduct of O.D. Vincent and Duke University, as stated in Paragraph 102, is wrongful, and constitutes a material breach of the Contract as specifically alleged herein, and, further, specifically declaring that:

a)    Andrew may not be deprived of his full right of access to and use of the University's intercollegiate golf program's training facilities for the rest of his college career;

b)    Upon his graduation, Andrew will have the same right of access to and use of the University's intercollegiate golf program's training facilities that is given to alumni of the Golf Program; and

c)    An individual's status as a "student" or "student-athlete" does not diminish or impair the contractual or common law rights enjoyed by all citizens who enter into private contracts governed by the laws of North Carolina and the United States.

2.    An award of compensatory damages against all Defendants, jointly and severally, in an amount to be determined by a jury, plus interest as provided by law;

3. An award of exemplary damages, jointly and severally, against O.D. Vincent, individually, and Duke University, in the amount that a jury determines to be sufficient to deter O.D. Vincent and Duke University from engaging in similar conduct in the future;

4. An award of attorneys' fees and the costs of this action; and

5. All other and further relief that the Court deems proper and just.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable in this matter.

Dated:  July 23, 2008    Respectfully submitted by:

            **EKSTRAND & EKSTRAND LLP**

            **/s/** Robert C. Ekstrand

            _____
            Robert C. Ekstrand (NC Bar #26673)
            Attn: Stefanie A. Sparks
            811 Ninth Street
            Durham, NC 27705
            Email: rce@ninthstreetlaw.com
            Email: sas233@law.georgetown.edu

            _Counsel for the Plaintiff, Andrew Giuliani_