# Exhibit D



Robert C. Ekstrand
(t) 919.416.4590
(f) 919.452.4647
rce@ninthstreetlaw.com

May 7, 2008

**VIA HAND-DELIVERY**
Ms. Pamela Bernard, Esq.
Vice President & General Counsel
Duke University
2400 Pratt Street
North Pavilion, Suite 4000
Durham, NC 27710

*In re: Andrew Giuliani*

Dear Pam:

I write with grave concerns for both Duke University and one of its students, Andrew Giuliani. The purpose of this letter is to provide you with the factual basis of those concerns. They arise out of the handling of a matter within the University's Athletic Department by the University's Head Men's Golf Coach, O.D. Vincent. Our Firm has investigated this matter carefully, and we believe that Coach Vincent's conduct has already exposed the University to liability in contract and in tort. The purpose of my letter is to mitigate the potentially catastrophic damages Coach Vincent's conduct will cause Andrew and the University to suffer. To that end, my letter concludes with a recitation of the available options, and a detailed proposal to avoid harm to the University and further harm to Andrew.

### Background

As you know, Coach Vincent replaced the late Rod Myers after his untimely passing in March of last year. Coach Myers recruited Andrew Giuliani to play Golf at Duke. Coach Myers offered Andrew a small scholarship, but Andrew refused so that the Coach Myers could use the funds to bring other players to Duke. Andrew matriculated to Duke in the Fall of 2005 with the intention to play golf professionally, and Coach Myers recruited Andrew to Duke with that understanding. While at Duke, Andrew has steadily progressed toward that objective. Upon graduating in May of next year, Andrew will embark upon a career in golf competing in professional tours. To be sure, that is a long and difficult path. Until only months ago, Andrew was on track.

Andrew had improved steadily as a golfer over his first two years at Duke, and he was named to the ACC Academic Honor Roll in his sophomore year. Andrew began his Junior year with success. He qualified for entry in the early tournaments of his Junior year. In the Fall of 2007, Andrew had already secured his position on the 2008-09 Team Roster by qualifying for and playing in two tournaments.

Prior to his qualifying for the 2008-09 Team Roster, there was no indication that any problem existed on the team with respect to Andrew. To the contrary, the evidence overwhelmingly shows that Andrew was well-liked by his coaches and his teammates. Emails and text messages that Coach Vincent and Assistant Coach Ryan Ressa sent to Andrew verify this. The Coaches, in particular, clearly liked Andrew and appreciated his attitude, his work ethic, and his desire for the team to win a championship. By way of example, in response to an email Andrew sent to the team encouraging them to attend optional workouts, Coach Vincent sent Andrew a message saying, "Nicely worded. Well done." That email was sent December 5, 2007. Similarly, Coach Ressa sent a text message to Andrew on the same day, saying, "Hey would u cc me on that e-mail u send to the guys ... proud of u for showing great effort this whole season..."

### *The Unilateral Cancellation of Andrew's Athletic Eligibility*

After Andrew had qualified for a place on the 2008-2009 team roster in the Fall, a relatively minor disagreement arose between Andrew and Brian Kim, another member of the team. Brian knocked an apple out of Andrew's hand twice, and the two exchanged unkind words. To avoid an escalation of the verbal exchange, Andrew left the team room. Brian followed him to the door, still goading Andrew verbally. When Andrew turned around, Brian slammed the door, inadvertently hitting Andrew's face. Andrew turned and continued walking to his car. Brian opened the door again, and continued shouting unkind comments at Andrew. Andrew still had the apple in his hand, and flipped it toward Brian from ten feet away, backhanded, hitting Brian. The exchange ended there. Andrew was not the first team member to have a difficult exchange with Brian; the event was hardly significant in the recent history of the team. More importantly, Andrew subsequently resolved his differences with Brian, and the two have developed a strong relationship.

### *Coach Vincent's Unauthorized Arrogation and Delegation of the Power to Unilaterally Cancel Andrew's Athletic Eligibility*

Coach Vincent notified Andrew that he was suspended from the team. He did this in front of the team. Andrew was presented with a short list of minor complaints ostensibly made by his teammates, but was not given an opportunity to explain or rebut them. The suspension was unprecedented in at least one respect: it was to be effective until every individual on the team roster wrote Coach Vincent a letter stating he wanted Andrew to return to the team and explaining why. If only one team member failed to write a letter that the Coach deemed sufficient, Andrew's suspension would be permanent: a de facto termination of his eligibility and access to the Athletic Program. In other words, the Coach not only delegated the power to cancel Andrew's eligibility and dismiss him from the athletic program

- 2 -

to the team members; he delegated to each individual member the unilateral authority to cancel Andrew's eligibility and dismiss him from the University's athletic program.

### *Cancelling Andrew's Eligibility and Dismissing Him from the Athletic Program Violates Several Express Athletic Department Rules.*

Coach Vincent has stripped Andrew of every privilege he had earned as a member of the Men's Golf Team, including, for example:

- Andrew's eligibility to qualify for participation in NCAA tournaments;
- Andrew's access to the University's golf course;
- Andrew's access to the University's golf team practice facilities and equipment;
- Andrew's access to parking near the University's athletic facilities.

The sanction imposed upon Andrew is the most severe sanction available under Athletic Department policies. Those policies provide for a progression of punishments, beginning with a reprimand, and culminating in cancellation of eligibility and dismissal from the athletic program in the following progression:

1. Reprimand
2. Probation
3. Suspension
4. Loss of Athletic Aid; and
5. Cancellation of eligibility and dismissal from the athletic program.

*See, Duke University Student-Athlete Handbook*, p. 13 ("Departmental Standards of Behavior") (annexed as <u>**ATTACHMENT 1**</u>).

In violation of the same rules, Coach Vincent abrogated the Handbook's progressive-sanction scheme. Andrew had never been reprimanded (formally or informally), he had not been placed on probation, and he had not been suspended for a fixed duration prior to his *de facto* dismissal. Despite the failure to identify or remediate any problems prior to this, Coach Vincent suspended Andrew "indefinitely" thereby cancelling his athletic eligibility. Further, Coach Vincent then deprived Andrew of access to athletic program facilities (also indefinitely).

In further violation of the same rules, Coach Vincent punished Andrew for alleged conduct that itself does not violate any of the enumerated "Standards of Behavior" set forth in the Student-Athlete Handbook.

In further violation of the same rules, Coach Vincent did not consult with the Director of Athletics before cancelling Andrew's eligibility and dismissing him. Apparently, Coach Vincent did not even notify his superiors of his action for several weeks.

- 3 -

In further violation of the same rules, Coach Vincent delegated the power to make a final determination of Andrew's eligibility and access to the athletic program to the returning members of the team. First, that power is one that Coach Vincent merely shared with the Athletic Director; therefore Coach Vincent could not unilaterally delegate it. Second, even if Coach Vincent and the Athletic Director had consulted and determined to delegate their shared power to the members of the team, any such delegation violates even the narrowest reading of Athletic Department and NCAA rules adopted by the University.

There is, in short, no basis in the governing documents to support Andrew's indefinite suspension from the team or the delegation of the power to determine team membership to the team members themselves. Coach Vincent's arrogation of the unilateral authority to cancel Andrew's eligibility and his subsequent delegation of that authority to Andrew's returning teammates is a continuing violation of material terms of the University's agreement with Andrew.

*In Addition to Violating Andrew's Contractual Rights, Coach Vincent's Conduct Was Malicious, Arbitrary, and Abusive to a Student*

Although stunned and hurt, Andrew immediately apologized to his teammates in writing. Andrew's apology letter is annexed as **ATTACHMENT 2**. In response to Andrew's apology, Brian Kim was the first to write a formal letter expressing his wish that Andrew be returned to the team. Brian Kim was the player involved in the incident that ostensibly precipitated Andrew's suspension, described above. Brian's letter is annexed as **ATTACHMENT 3**. At least 8 other team members responded to Andrew verbally so positively and so swiftly that it was obvious that Andrew's suspension would be short lived.

Despite the team members' strong showing of support for Andrew, Coach Vincent did not return Andrew to his status as a team member. Instead, he directed the team members to slow down, and he instructed Andrew to cease his continuing efforts to establish the support of his teammates. By way of example, Andrew's roommate and member of the team, Clark Klaasen, approached the coach to say that he wanted to take a leadership role in restoring Andrew to the team. Coach Vincent curtly advised Klaasen that he not want him to do that, and advised him to "concentrate on his game." The cumulative effect of Coach Vincent response to the players' support of Andrew was clear: the Coach was trimming the roster to a squad of 6 or 7 players—halving the current roster of 12 or 13—and it was not in their personal interests for Andrew to remain one of the 6 or 7. The team members did as Coach Vincent directed. As a direct result, the team members' expressions of support for Andrew were silenced, nothing happened, the weeks dragged on, and Andrew's suspension became the status quo through inertia.

In late March, 2008, Coach Vincent changed the qualifying rules for next year's roster, but only as they applied to Andrew. By that time, Andrew was already exempt from qualifying for next years' roster because he had qualified to play in two traveling tournaments in the fall. Similarly, 5 other players were also exempt from having to qualify for next year's roster. The players who had not earned the exemption could qualify for next year's roster

- 4 -

Case 1:08-cv-00502-WO-WWD   Document 9-5   Filed 09/10/08   Page 5 of 10

only through an extremely difficult intra-squad qualifier. However, Coach Vincent notified Andrew that he would have to "re-qualify" in the same way that the non-exempt players would. But even assuming Andrew did "re-qualify," he was still suspended as the suspension was not resolved by "re-qualifying." When Andrew protested that he had already qualified for next year's team, Coach Vincent suggested to Andrew that, if Andrew agreed to certain time parameters Coach Vincent wanted to impose concerning the suspension, Coach Vincent may let Andrew's qualification stand. Coach Vincent advised Andrew that he would contact him about those parameters.

Soon thereafter, on April 2, 2008, Coach Vincent sent Andrew a text message asking him to come by the next day and saying, "I have a draft for you to look at and sign." Concerned about the nature of the document, Andrew's step-father flew from California to Duke that night to be with Andrew for the meeting with Coach Vincent. At the meeting, Coach Vincent presented the document for signature, but Andrew did not sign it. Further, Andrew's step-father told Coach Vincent that they had no agreement, but instead the document described a system the Coach had imposed. After Andrew's father left town, Coach Vincent summoned Andrew to his office again, and asked him to sign the same Agreement. Andrew told Coach Vincent he had promised his mother and step-father he would not sign anything without the benefit of their counsel, and so declined to sign the document again. Coach Vincent's response to Andrew was chilling: he told Andrew, "that's a bad decision."

The unsigned "Agreement" is annexed hereto as **ATTACHMENT 4**. The Agreement itself did not resolve the suspension; instead, the only purpose it could have served was to have Andrew ratify the prior and ongoing violations of the University's agreement with Andrew. While Coach Vincent referred to the agreement as a "paper" and characterized it has having no "legal" consequence, it is obvious that its purpose was to memorialize Andrew's waiver of his rights as a student-athlete at Duke, among other things. It soon was apparent what Coach Vincent meant when he told Andrew his refusal to sign the Agreement was "a bad decision."

*Retaliation for Andrew's Refusal to Sign the Coach's Agreement*

Within 48 hours of Andrew's refusal to sign Coach Vincent's Agreement, a sequence of retaliatory actions and decisions began. For example:

- Within 48 hours of Andrew's refusal to sign the Coach Vincent's Agreement, 5 of the 6 team members sent Andrew a joint e-mail telling him they did not want him to return. All but one of them had recently told Andrew they wanted Andrew to return to the team. The email is annexed as **ATTACHMENT 5**.

- Not long after that, Andrew found a note on his windshield telling him that his car will be towed away if he parks at Karcher Center because it is only for "team members." The parking violation warning is annexed as **ATTACHMENT 6**.

- Soon thereafter, Assistant Coach Ressa sent an e-mail to the University Golf Course's Pro Shop saying that Andrew was terminated from the team and directing Pro Shop personnel to deny Andrew any courtesies, privileges or access routinely given to team members. Assistant Coach Ressa's e-mail to the Pro Shop is annexed as **ATTACHMENT 7**.

- Soon thereafter, the Coach and the team met at the Golf Course where Andrew was practicing on the public range. At the conclusion of the meeting with Vincent, the returning team members together confronted Andrew and told him to stop trying to return to the team. In the same confrontation, they publicly disparaged and tried to intimidate Andrew. One of the "student decision makers" even suggested that Andrew leave Duke University. In all likelihood, this confrontation was initiated with Coach Vincent's approval and subsequently ratified by him.

In hindsight it is clear that Andrew's good faith efforts were futile. They were thwarted from the beginning by a novel system that was designed to cause Andrew to fail. When Andrew appeared to be succeeding even in that system, Coach Vincent intervened to reverse Andrew's early success. The procedure Coach Vincent invented and applied only to Andrew was stripped of even the most rudimentary features of due process, leaving aside the more significant safeguards guaranteed by the Duke Student-Athlete Handbook and Athletic Department Handbook, University Bulletin, and NCAA rules adopted by the University.

For very sound reasons, even Coaches do not have unilateral authority to cancel a student-athlete's eligibility. For the same reasons, a Coach and the University's Athletic Director cannot delegate their shared power to cancel a student-athlete's eligibility to the student-athlete's teammates. The reasons made themselves self-evident after Coach Vincent did so in these circumstances. For example:

- the student "decision makers" are hopelessly biased; they all have a personal stake in Andrew's continuing exclusion from the team because they are competing with Andrew for limited spots on the squad and they are the personal beneficiaries of his exclusion;

- there is evidence that 5 of the 6 student "decision makers" had engaged in conduct that—unlike Andrew's alleged conduct—actually do violate the "Departmental Standards of Behavior" enumerated in the Student-Athlete Handbook, and their retaliation for Andrew's non-participation in that conduct may the source of an improper motivation of the team members;

- the "student decision makers" are subject to the obvious influence of the coach whom they had reason to believe did not want them to "vote" Andrew back onto the team;

- the process was susceptible to abuse because it was entirely opaque;

- 6 -

Case 1:08-cv-00502-WO-WWD   Document 9-5   Filed 09/10/08   Page 7 of 10

- the "student decision makers" were allowed to operate in complete secrecy; and

- the "student decision makers" were authorized to render their decision without notice of specific violations alleged, without confronting Andrew with any 'evidence' to support the allegations, without affording Andrew an opportunity to respond to any such evidence, and without having to provide any explanation of their rationale for making the decision (verbally or in writing).

In violation of its agreement with Andrew, the University deprived Andrew of his eligibility and access to the University's athletic program without the due process that is required in the Athletic Department Manual, the Student-Athlete Handbook, among other things. As a consequence, Andrew has and will continue to lose valuable time practicing and competing in preparation for his professional career, and, in addition, damages to his professional prospects and reputational harm.

### *The Possible Outcomes*

There is an enormous urgency in resolving this problem. One of the dimensions of the damages Andrew will suffer as a result of Coach Vincent's conduct is that he will be subjected to punishing public obloquy and scrutiny in the New York and national media. Andrew's role on this team is already a national story. The reputational harm he would suffer from a negligent disclosure of the events described here would be irreparable.

It is just as plain that there are only a few possible outcomes in this matter.

1. The first outcome would be for Andrew to simply quit. Quitting is not an option. Not only would that thwart his career aims, he would be subjected to inordinate public scrutiny and irreversible reputational harm. Further, there is no reason to justify his involuntary resignation from the team.

2. The second option would be triggered by the University's failure to intervene. The failure to act under these circumstances would plainly ratify Coach Vincent's egregious conduct, and would be a direct cause of damages described above, including the unique and irreversible reputational harm that would flow from reports of this result in the national media. This would leave Andrew with only the legal and equitable remedies available through litigation. There will be no other course for Andrew to pursue in this event.

3. The third option is the option that Andrew has so vigorously worked to achieve from the first: the restoration of his eligibility and membership on the Men's Golf team.

### *The Solution*

If you accept the straightforward proposition that the rules must be followed, and team members cannot be delegated the power to unilaterally cancel another team member's athletic eligibility, the proper resolution follows along the lines of well-settled legal principles. Coach

Case 1:08-cv-00502-WO-WWD   Document 9-5   Filed 09/10/08   Page 8 of 10

Vincent's arrogation and delegation of unilateral authority to cancel athletic eligibility were both void *ab initio*, and the proper remedy is to restore the status quo ante. Further, in light of Coach Vincent's proclivity to engage in retaliatory conduct directly and through members of the team, some form of injunctive safeguards must be implemented. Specifically, we believe that the following elements would be necessary to restoring the *status quo ante*:

- Restore Andrew's previously earned qualification for membership on the 2008-09 Team Roster;
- Restore Andrew's access to the team's training facilities and all other privileges of the University's established athletic program, including future privileges and courtesy afforded to alumni of the University's athletic program;
- As a member of the 2008-09 Team, Andrew will compete for placement in tournaments in the same manner and on the same terms as other returning members;
- To remediate the recent events and the unjustified denial of Andrew's access to the golf course and practice facilities, Andrew should be should be guaranteed to play in the first two varsity tournaments next semester;
- Coach Vincent will make no unilateral decisions viz. Andrew's playing or participating without pre-approval from a disinterested third-party designee within the General Counsel's office.
- Anti-retaliation measures to safeguard against retaliatory conduct by the Coach and / or team members, with clearly defined consequences for conduct found to be retaliatory through fair and open procedures within the University system;

We are aware that this proposal will present great challenges for Andrew. I assure you that Andrew is uniquely able to manage and overcome those challenges. Andrew wants only the benefit of the bargain he struck when he accepted Duke's offer to enroll as a member of its student body and its Golf Team; nothing more and nothing less. In light of the challenges that his teammates and his Coach may face in reacting appropriately to measures required to restore the *status quo ante*, I suggest utilizing the enormous talents of Professor Greg Dale, who has worked with nearly every team at Duke, but has little exposure to the Men's Golf Team. Professor Dale has proven to be capable of turning these kinds of personal and team challenges into transformative educational experiences for every individual involved.

*The Proposed Solution is the Only Option that Furthers the Educational Mission of the University.*

To be sure, Coach Vincent's conduct has exposed the University to significant liability. More importantly to all concerned, Coach Vincent's decisions and their consequences are completely at odds with the basic educational mission of our University. Cancelling Andrew's eligibility without notice, hearing or grounds; fostering his alienation from his team; imposing the most severe sanction without any progression of responses and

- 8 -

Case 1:08-cv-00502-WO-WWD   Document 9-5   Filed 09/10/08   Page 9 of 10

punishments; and encouraging Andrew's teammates to perpetuate his plight in furtherance of their own personal ambitions are all at odds with Duke University's most fundamental educational purposes.

We know this: This matter will surely come to an end. How the University determines to end it will just as surely teach each student involved powerful lessons. These facts present an opportunity and a danger. The opportunity is for higher-order teaching and learning. The danger is that doing nothing in the face of all that has occurred will teach the wrong lessons to those involved and to those who are watching. What we propose may require significant short-term effort, but such effort is always required to create transformative educational experiences.

I look forward to discussing this matter with you directly.

Cordially,

Robert C. Ekstrand

RCE/tlp

Enclosures