# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

Case No. 1:08-CV-502

| | |
|---|---|
| ANDREW GIULIANI,<br><br>                     Plaintiff,<br><br>  v.<br><br>DUKE UNIVERSITY AND ORRIN<br>DANIEL VINCENT, III,<br><br>                 Defendants. | BRIEF IN SUPPORT OF DEFENDANTS'<br>MOTION FOR JUDGMENT ON THE<br>PLEADINGS |

NOW COME the Defendants in the above-captioned matter, Duke University ("Duke") and Orrin Daniel Vincent III ("Coach Vincent"), pursuant to LR7.2 and LR7.3, and submit this Memorandum in support of their Motion for Judgment on the Pleadings.

## <u>NATURE OF THE PROCEEDING</u>

This case arises from the complaints of a non-scholarship college golfer whose conduct led his coach to suspend him from the team. This decision did not affect his academic standing nor end his eligibility to play college golf. Nonetheless, Andrew Giuliani ("Giuliani") claims that Coach Vincent and Duke breached a binding contract that: (1) entitled him to play on the varsity golf team at Duke for so long as he was a student, and then; (2) entitled him to use Duke's golf facilities for the rest of his life without charge. This contract is claimed to be contained within the hundreds of pages of documents attached to the Complaint, all of which consist of standard handbooks

provided to Duke students or student-athletes. The law governing this case – and thus its outcome – has been articulated previously by this Court: There is no such contract. These student publications neither constitute a contract nor, under any construction of them, establish the contract that Giuliani claims exists. Put simply, Giuliani had no right to play varsity golf; he had an opportunity for the privilege to be part of the team, one which the Complaint and exhibits to the pleadings reveal that he squandered through his own conduct.

## STATEMENT OF FACTS[1]

Giuliani alleges that he was recruited to Duke by then-Coach Rod Myers. (Compl. ¶ 11.) Coach Myers purportedly described the benefits of Duke's golf program, which include an opportunity – but not a guarantee – to compete in intercollegiate tournaments. (Id. ¶ 13.) Coach Myers also allegedly told Giuliani that after graduation, he would have life-time free access to Duke's golf facilities. (Id. ¶ 13.) Giuliani claims that he chose Duke because he believed Duke could help him "achieve his dream" of being a touring professional. (Id. ¶¶ 12-14.) He did not receive a golf scholarship nor sign a letter of intent. (Id. ¶ 15.) In March 2007, Coach Myers unexpectedly died after a short illness; Coach Vincent became Duke's men's golf coach in the summer of 2007. (Id. ¶ 3.)

As the 2007-08 season progressed, Giuliani's behavior became increasingly disruptive. As conceded by the Complaint, and among other incidents, Giuliani argued with and disobeyed a strength-training coach assigned to the golf team (Answer Ex. A);

---

[1] For purposes of this Motion, the Defendants assume the truth of the allegations asserted in the Complaint unless contradicted by documentary exhibits. See pp. 7-8 infra.

he broke a club; he deliberately disrupted his playing partners with his pace of play; and he became physically aggressive with other players during a training session (id., Compl. ¶ 19). Finally, on 10 February 2008, Giuliani physically assaulted a teammate by hurling an apple that hit him squarely in the face. (Id.) The next day, Coach Vincent recounted these events and suspended Giuliani from the team. (Id. ¶¶ 19, 21; Answer Ex. A.) The terms of the suspension were read to Giuliani and the team. (Answer Ex. A.) Coach Vincent's action was consistent with what the golf team members had been told in the 2007-08 Duke Men's Golf Players Guide: "Exceptional team behavior and appearance is one of our highest priorities. . . . All behavior and appearance that is inappropriate will not be tolerated and be addressed immediately. . . . All players are expected to conduct themselves in an exceptional manner at all times." (Id. Ex C.)

Coach Vincent told Giuliani that to initiate lifting his indefinite suspension, all thirteen of his teammates would be required to support his reinstatement as a first step. (Compl. ¶ 21.) In order to gain this support, Giuliani claims that he met at least twice with each returning player. (Id. ¶ 28.) He further claims that he "acknowledged" that he had caused hurt feelings and asked for forgiveness. (Id. ¶ 26.) It is undisputed that his thirteen teammates did not unanimously support his return to the team for the Spring of 2008. (Id. ¶ 43.)

When it became clear that Giuliani would not be a member of the golf team for the 2008 Spring season, he turned his attention to the 2008-09 season, meeting several times with Coach Vincent. (Id. ¶¶ 34, 39, 42.) Coach Vincent provided Giuliani with another

opportunity to rejoin the team, requiring that he receive the unanimous support of the six returning team members and asking him to agree to confine his behavior to certain parameters. (Id. ¶ 34.) Coach Vincent subsequently prepared a document to describe the conditions under which Giuliani could end his suspension and return to the team. (Id. ¶ 36, Ex. 1.) In the first week of April 2008, Coach Vincent presented these conditions to Giuliani twice: Once alone, and once in a meeting with Giuliani's step-father and Assistant Athletic Director Michael Sobb. (Id. ¶¶ 39, 42.) Giuliani refused to agree. (Id. ¶ 42.) On 9 April 2008, five of the six returning team members wrote to Giuliani, telling him that they had decided not to support his return. (Id. Ex. 2.) Coach Vincent, they wrote, "had no part in this" decision. (Id.) Thereafter, Giuliani's privileges to play free golf and park in spaces closer to the golf course than the general public were withdrawn. (Id. ¶ 43.) Giuliani remains a Duke student, with the same access to parking, golf, and educational opportunities as his fellow students.

Having failed to convince his coach or his teammates that he should return to the team, Giuliani and his family next appealed to Duke's athletic administration, and specifically spoke with Interim Athletic Director Dr. Christopher Kennedy. (Id. ¶ 45.) Dr. Kennedy met with Giuliani and six of his teammates. (Id. ¶ 45.) Once Giuliani and his parents indicated that they had retained legal counsel, Duke's General Counsel then attempted to respond to Giuliani's concerns, including responding to a detailed demand letter from his attorney. (Id. ¶ 48.) Indeed, through his lawyer, Giuliani demanded not only reinstatement to the team, but also guaranteed playing time. (Answer Ex. D at 8.)

He also demanded that any future coaching decisions about him be pre-approved by "a designee within the General Counsel's office." (Id.)

While the General Counsel's review was ongoing, Giuliani's family attempted to bypass this process through a meeting with Duke's senior academic officer, Provost Peter Lange. (Compl. ¶ 51.) Before the Lange meeting, the General Counsel's office wrote Giuliani and indicated that its review on behalf of Dr. Kennedy indicated that Coach Vincent possessed the authority to take the actions that had been taken. (Id. ¶ 52; Answer Ex. E.) The letter further noted that, if dissatisfied, Giuliani had further recourse by requesting that a review be conducted by the Faculty Athletics Representative under Duke's existing policies. (Answer Ex. E.)

Duke has a procedure "intended to provide recourse for student-athletes who feel they are subject to serious mistreatment" by a coach. This procedure consists of three levels of review: (1) a meeting with the coach; (2) a meeting with the coach and up to two assistant or associate athletic directors; and (3) an application to the Faculty Athletics Representative for a hearing before a panel of the Duke Athletic Council. (Compl. Ex. 6 at 22-23.) The Faculty Athletics Representative meets regularly with, and reports to, Duke's president. (Id. at 11, 47-48.) The Duke Athletic Council is comprised of faculty, students, and alumni. (Id. at 7.) Having progressed through the first two steps, Giuliani chose not to take the final step and, instead, filed this lawsuit. (Id. ¶¶ 52, 54.)

Giuliani claims that his suspension had nothing to do with his actions; rather he claims that it was motivated by Coach Vincent's "rush" to reduce the size of the men's

golf team – a transition that had been ongoing since before the season. (Id. ¶¶ 17, 20.) He alleges that, despite his teammates' statement to the contrary, Coach Vincent pressured them. (Id. ¶ 30.) Despite Coach Vincent's announcement to the team of Giuliani's suspension, despite his suggestion that Giuliani meet with team members individually, and despite the presence of Giuliani's step-father and an assistant athletic director when this idea was presented (id. ¶¶ 18, 39, Ex. 1 at 1), Giuliani claims that his suspension was a "secret" one (id. ¶¶ 38, 41). In fact, the only "secret" was that Coach Vincent indicated the team's correspondence with him about Giuliani's suspension would be confidential to protect relationships among team members. (Id. ¶ 38, Ex. 1 at 1.)

## QUESTIONS PRESENTED

I.      Whether Defendants are entitled to judgment as to Giuliani's contract claims, because the Complaint fails to allege the existence of an enforceable promise;

II.     Whether Defendants are entitled to judgment as to Giuliani's tortious interference with contract claim when there was no contract;

III.    Whether Defendants are entitled to judgment as to Giuliani's claim for affirmative promissory estoppel; and

IV.     Whether Defendants are entitled to judgment as to Giuliani's declaratory judgment claim, when his substantive claims have no merit.

## ARGUMENT

Giuliani's claims hinge on his allegation that he had a contract that guaranteed him a place on Duke's varsity golf team and provided him with free golf benefits for life.

- 6 -

(See Compl. ¶¶ 15-16.)  He claims breach of this contract and tortious interference with it, and seeks money damages as well as a declaratory judgment.  (Id. ¶¶ 102-05.) Giuliani is demonstrably wrong.  He had no contractual right to play intercollegiate golf, let alone one that entitled him to the golf privileges he claims.  Accordingly, his contract, implied contract, and tortious interference claims necessarily fail, and, because his substantive claims have no merit, he is entitled to no declaratory relief.

To survive a motion for judgment on the pleadings, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face."  Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008) (citing Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1974 (2007)) (emphasis in original).  The factual allegations "must be enough to raise a right to relief above the speculative level."  Twombly, 127 S. Ct. at 1974.  In making this determination, the Court assumes the complaint's well-pleaded facts are true and draws all reasonable factual inferences from the pleadings in plaintiff's favor.  Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999).  The Court need not, however, accept as true factual allegations "that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  Veney v. Wyche, 293 F.3d 726, 730 (4th Cir. 2002).  The Court can consider any exhibits attached to either the answer or the complaint.  Eagle Nation, Inc. v. Mkt. Force, Inc., 180 F. Supp. 2d 752, 754 (E.D.N.C. 2001).  Allegations in the complaint that are inconsistent with the terms of a properly considered written document, or that state mere legal conclusions, need not be accepted as true. Blankenship v. Manchin, 471 F.3d 523, 529 (4th Cir. 2006) ("We must accept the

- 7 -

allegations in the complaint . . . unless they . . . contradict matters properly subject to judicial notice or by exhibit."); Veney, 293 F.3d at 730 ("Nor must we accept as true allegations that contradict matters properly subject to judicial notice or by exhibit."); GFF Corp. v. Associated Wholesale Grocers, Inc., 130 F.3d 1381, 1385 (10th Cir. 1997).

## I.    Giuliani Has No Contractual or Other Right to Play Golf.

Giuliani alleges that he had a binding contract that guaranteed he could play on the Duke men's golf team for four years and have unfettered free access to Duke's golf facilities for life.  (Compl. ¶¶ 15-16, 59, 62.)  He claims that Duke and Coach Vincent breached this contract when they told him that he could no longer play on the golf team, use the practice facility for free, and park where he wanted.  (Id. ¶¶ 62, 66, 70-72, Ex. 3.) These claims fail because Giuliani does not allege the elements of an enforceable contract that confers the rights that he claims to have lost.  Specifically, he has not identified any contractual obligation as the basis of his claim.  Brewer v. Jefferson-Pilot Standard Life Ins. Co., 333 F. Supp. 2d 433, 439 (M.D.N.C. 2004); Johnson v. Mayo Yarns, Inc., 126 N.C. App. 292, 297, 484 S.E.2d 840, 843 (1997).[2]

Playing an intercollegiate sport is a privilege, not a right.  See Miami Univ. Wrestling Club v. Miami Univ., 302 F.3d 608, 615 (6th Cir. 2002); Colo. Seminary Univ.

---

[2] This Court, sitting in diversity, applies North Carolina's choice-of-law rules. Colgan Air, Inc. v. Raytheon Aircraft Co., 507 F.3d, 270, 275 (4th Cir. 2007).  Under those rules, the governing law comes from the state where the last act to form the contract occurred.  Key Motorsports, Inc. v. Speedvision Network, L.L.C., 40 F. Supp. 2d 344, 347 (M.D.N.C. 1999).  Here, Giuliani alleges that the contract formed when he enrolled at Duke.  (Compl. ¶ 15.)  Accordingly, North Carolina law governs.  Nevertheless, the application of New York law yields the same results, as discussed later in this Brief.

- 8 -

v. Nat'l Collegiate Athletic Assn, 417 F. Supp. 885, 895 (D. Colo. 1976); (Answer Ex. C at 2 ("Representing Duke and the men's golf team is a privilege.")). No North Carolina court has ever recognized a breach of contract claim based on a university's decision to prevent a student from playing sports, and courts in other jurisdictions have rejected similar claims. See, e.g., Hysaw v. Washburn Univ. of Topeka, 690 F. Supp. 940, 946-47 (D. Kan. 1987) (written scholarship contract did not include implied provision that plaintiffs would be allowed to play football); Jackson v. Drake Univ., 778 F. Supp. 1490, 1493 (S.D. Iowa 1991) (written financial aid agreement between student-athlete and college did not include implied provision of right to play); see also Hendricks v. Clemson Univ., 578 S.E.2d 711, 717 (S.C. 2003) (university entitled to summary judgment on student's claim that it breached a contract by failing to ensure athletic eligibility). Nothing about Giuliani's claims warrants a departure from this precedent.

A.    **Plaintiff Fails to Allege the Existence of an Enforceable Contract.**

Giuliani alleges that four documents – the Duke University Student Bulletin, the Duke University Student-Athlete Handbook, the Duke University Athletic Department Policy Manual, and the 2007-08 NCAA Division I Manual – constitute his entire contract with Duke. (Compl. ¶¶ 16, 60.) This Court has specifically held, however, that Duke's internal publications do not constitute binding contracts. See Mercer v. Duke Univ., No. 97-cv-00959, slip. op. at 13 (M.D.N.C. Sept. 28, 2000) (attached as Ex. 1); Love v. Duke Univ., 776 F. Supp. 1070, 1075 (M.D.N.C. 1991), aff'd, No. 91-2263, 1992 WL 60230 (4th Cir. Mar. 30, 1992). Giuliani's claim is no different.

In <u>Love</u>, this Court granted Duke's motion for summary judgment on a plaintiff's claim that Duke's student bulletin – one of the documents on which Giuliani relies – entitled him to contractual rights. That document, the Court concluded, "is not a binding contract." 776 F. Supp. at 1075. The Fourth Circuit affirmed this decision "for the reasons stated by [this] court in its memorandum opinion." 1992 WL 60230, at *1. In <u>Mercer</u>, a student who was denied a place on the football team alleged that information in Duke's student handbook gave rise to a breach of contract claim. This Court again ruled that the policies in the manual were not part of any contract between the student and Duke. <u>Mercer</u>, No. 97-cv-00959 at 13.

Aside from Duke's publications, the Fourth Circuit has held that another university's student policy manuals are not contracts. In <u>Tibbetts v. Yale</u>, 47 F. App'x 648, 656 (4th Cir. Sept. 26, 2002), the Fourth Circuit denied a plaintiff's motion to amend his complaint to add a breach of contract claim against Yale. The plaintiff argued that a chapter in Yale's student bulletin constituted a contract between him and Yale. The Fourth Circuit concluded that his claim was "without merit," because "Chapter 11 of the Student Handbook is not a contract but merely a university policy." <u>Id</u>.

In addition to the student bulletin deemed non-contractual in <u>Love</u> and <u>Mercer</u>, Giuliani's purported contract consists of policy documents that pertain to the internal affairs of Duke's athletic department and its relationship with the NCAA. (Compl. ¶¶ 16, 60.) The Student-Athlete Handbook covers a wide variety of issues, including department-wide standards of conduct for certain activities, such as academic

- 10 -

participation, computer use, alcohol, hazing, and harassment. (<u>Id.</u> Ex. 5 at 2, 13.) The Athletic Department Policy Manual describes the department's administrative structure and contains internal policies and procedures. (<u>Id.</u> Ex. 6 at 3.) These policies include a tailored grievance procedure "to provide recourse for student-athletes who feel that they are subject to serious mistreatment." (<u>Id.</u> Ex. 6 at 22-23.) The remaining document, the NCAA Division I Policy Manual, governs that organization's relationship with its member institutions of higher education. It concerns a wide range of subjects – budgeting, administrative structure, certification requirements, and the like – that have no bearing on this case. (<u>Id.</u> Ex. 8 at 4-7.) The NCAA Division I Manual does set forth basic ethical principles (<u>id.</u> at 15, 23) and discusses contractual agreements <u>for coaches</u> (<u>id.</u> at 24), but Giuliani makes no specific reference to provisions he considers pertinent.

While these documents apply to Giuliani's relationship with Duke, they are not binding contracts. <u>Love</u>, 776 F. Supp. at 1075; <u>Mercer</u>, No. 97-cv-00959 at 15. As with the student bulletin at issue in <u>Love</u> and <u>Mercer</u>, none of these documents contains the necessary language to establish mutual assent to contractual promises or obligations. Here, as in those cases, none of these documents allegedly are incorporated in some other, identifiable contract; they comprise the "contract" in its entirety. (Compl. ¶¶ 16, 60.) Accordingly, the result here is the same: Giuliani has no breach of contract claim arising from these university publications. <u>Love</u>, 776 F. Supp. at 1075; <u>Mercer</u>, No. 97-cv-00959 at 15.

Case 1:08-cv-00502-WO-WWD   Document 11   Filed 09/10/08   Page 11 of 22

This result is consistent with traditional judicial deference toward the internal operations of a university concerning its relationship with students.  See Davis v. Univ. of N.C., 263 F.3d 95, 101-02 (4th Cir. 2001).  The relationship between a private university and its students is essentially a private one, such that the university has wide discretion to determine who is eligible to participate in extracurricular activities.  Romeo v. Seton Hall Univ., 875 A.2d 1043, 1049 (N.J. Super. A.D. 2005).  The "rigid importation of contractual doctrine" to this relationship "should be regarded as interfering beyond an acceptable degree in the university's discretion to manage its affairs."  Rollins v. Cardinal Stritch Univ., 626 N.W.2d 464, 470-71 (Minn. Ct. App. 2001) (rejecting a claim that a student's disciplinary proceeding violated the terms of a student handbook); see also Kupec v. Atlantic Coast Conf., 399 F. Supp. 1377, 1380-81 (M.D.N.C. 1975) (the laudable goals of collegiate athletics are best achieved by supervising institutions "left free to do so by the courts").  This deference is particularly compelling when it involves a coaching decision about who will play on a team for which the coach is responsible.  Such interference would usurp the very authority a coach needs to be effective with individual team members and with the team as a whole.

## B.    Plaintiff's "Contract" Does Not Provide the Benefits That He Claims.

Even without considering Love and Mercer, Giuliani's alleged contract fails for another reason:  It does not satisfy basic elements of a contract – an identifiable promise and mutual assent to be bound to it.  See, e.g., Ruegsegger v. W. N.M. Univ. Bd. of Regents, 154 P.3d 681, 688 (N.M. App. 2006), cert. denied, 149 P.3d 942 (N.M. 2006)

- 12 -

(athlete failed to state contract claim based on provisions of student handbook, because handbook constituted policy guidelines, not enforceable contract provisions).

Plaintiff cannot point to a single provision or any combination of provisions in alleged contract documents that promises him what he claims he is due: The right to play on Duke's golf team, to park in preferred spots, and to use Duke's practice facilities free of charge for the rest of his life. (Compl. ¶ 59.) Indeed, his "contract" – the several hundred pages of policy documents that contain all "provisions of the Contract that are at issue in this action" (Compl. ¶ 60) – is completely devoid of such promises. Because the alleged agreement does not contain the promises to which Giuliani claims he is entitled, his contract claims fail as a matter of law. <u>Ryan v. Univ. of N.C. Hosp.</u>, 128 N.C. App. 300, 302, 494 S.E.2d 789, 791 (1998) (breach of contract claim against university must point to an identifiable contractual promise); <u>Hendricks</u>, 578 S.E.2d at 717 (judgment for university on contract claim where no identifiable promise breached).[3]

Moreover, Giuliani's "contract" fails another elementary legal requirement: It shows no intent that the parties are bound. <u>See Parker v. Glosson</u>, 182 N.C. App. 229,

---

[3] The same is true under New York law, which also forbids contract claims absent an identifiable promise. <u>See</u> <u>Tie-Malabanan v. Univ. of Rochester</u>, No. 07-CV-6499-CJS, 2008 WL 788637, at *5 (W.D.N.Y. Mar. 21, 2008); <u>Radin v. Albert Einstein Coll. of Med. of Yeshiva Univ.</u>, No. 04 Civ. 704(RPP), 2005 WL 1214281, at *9-11 (S.D.N.Y. May 20, 2005). Moreover, because none of these oral promises were capable of being performed within one year, they are unenforceable under New York's statute of frauds. <u>See</u> N.Y. Gen. Oblig. Law § 1-507.

Case 1:08-cv-00502-WO-WWD   Document 11   Filed 09/10/08   Page 13 of 22

232, 641 S.E.2d 735, 737 (2007).[4] None of the documents that allegedly constitute the contract evince that intent, in no small part because their terms can be unilaterally altered at any time. See Southwell v. Univ. of Incarnate Word, 974 S.W.2d 351, 356 (Tex. App. 1998); Mahovongsanon v. Hall, 529 F.2d 448, 450 (5th Cir. 1976); Abbario v. Hamline Univ. Sch. of Law, 258 N.W.2d 108, 114 (Minn. 1977); see also Brooks v. Hackney, 329 N.C. 166, 170, 404 S.E.2d 854, 857 (1991) (a contract without sufficiently definite terms is unenforceable); Boyce v. McMahan, 285 N.C. 730, 734, 208 S.E.2d 692, 695 (1974) (alleged contract that leaves terms open for future agreement is not enforceable).

The Duke student bulletin provides, among its very first statements, that Duke reserves the right to change "matters described herein without prior notice." (Compl. Ex. 7 at 4.) The NCAA Division I Manual is replete with provisions that have been altered since Giuliani's arrival at Duke. (Id. Ex. 8 ¶¶ 11.2.2, 13.02.7, 13.02.14, 14.1.2.3.) The policies and procedures in the Athletic Department Manual may be modified by Duke's president, who entertains potential changes annually. (Id. Ex. 6 at 3.) The Duke University Student-Athlete Handbook, which contains departmental standards that Giuliani claims establish the sole boundaries for his behavior, also contemplates unilateral changes and additions. (Id. ¶¶ 62, 66.) Indeed, it specifically provides that "individual teams are free to develop their own team rules." (Id. Ex. 5 at 11.) Finally, the 2007-08 Duke Men's Golf Players Guide describes additional goals and expectations for Duke golfers. The Players Guide acknowledges that the team's "rules and procedures

---

[4] Not surprisingly, New York imposes these same legal requirements for contract formation. See Oscar v. Zacharius, 893 F. Supp. 250, 255 (S.D.N.Y. 1995).

are constantly evolving," and that "situations arise that have not been defined" and must be addressed individually. (Answer Ex. C at 2.) For these reasons:

> It is not realistic to anticipate all possible scenarios, so we will always be amending and improving our rules. Consistency and fairness in dealing with consequences is critical in the successful implementation of rules and procedures. However, since no two people or circumstances are ever alike, we will occasionally deal with seemingly similar situations individually and personally at the coaches' discretion.

(Id. at 8.) The Players Guide also establishes expectations for behavior, because team members "have a tremendous opportunity and along with it comes responsibility." (Id.) "Exceptional team behavior . . . is one of our highest priorities," the Players Guide provides. "All behavior . . . that is inappropriate will not be tolerated and [will] be addressed immediately." (Id. at 7.) "All players are expected to conduct themselves in an exceptional manner at all times." (Id. at 9.)

Giuliani was not on scholarship and had no obligation to play golf for Duke. Under NCAA rules, "the commitment of a prospective student-athlete to attend a particular institution" is established by a letter of intent. (Compl. Ex. 8 ¶ 13.02.10.) Giuliani did not sign a letter of intent. He received no financial aid. He had no obligation to play on the men's golf team. If he had decided to stop playing on the men's golf team – or if he dropped out of school entirely – Duke would have no contract claim against him.[5] The same applies to his claims against Duke. Jackson v. Drake Univ., 778

---

[5] A scholarship athlete incurs an obligation to play a sport only in exchange for the provision of scholarship funds. The university has no corresponding obligation to permit a particular person to play on a team in exchange for that student's promise to attend classes at the university.

F. Supp. 1490, 1492-93 (S.D. Iowa 1991) (any contract between student-athlete and university confined to obligations of financial aid agreement).

Because Giuliani cannot show the basic elements of a contract to play golf, Duke is entitled to judgment on his breach of contract claims, including breach of an implied covenant of good faith and fair dealing. That covenant arises only in the context of a contract that governs the subject matter of the dispute. <u>Dull v. Mutual of Omaha Ins. Co.</u>, 85 N.C. App. 310, 318, 354 S.E.2d 752, 756-57 (1987); <u>see also</u> <u>Strategic Outsourcing, Inc. v. Cont'l Cas. Co.</u>, 274 Fed. App'x 228, 233-34 (4th Cir. 2008) (North Carolina courts have not determined whether implied covenant of good faith applies to contract where either party may terminate with notice). Because no contract governs Giuliani's golfing privileges, he cannot state a claim for breach of a term implied in such contract.[6]

## II.    <u>Since There Is No Contract, There Can Be No Tortious Interference with a Contract.</u>

Giuliani claims that Coach Vincent "intentionally, maliciously, fraudulently, and without justification induced the University to cease performance of the Contract." (Compl. ¶ 88.) The elements of a claim for tortious interference with a contract are

(1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the

---

[6] Moreover, and as revealed by the Complaint itself, Giuliani has failed to comply with a condition precedent to making a claim for breach (and indeed has failed to comply with Rule 9(c) of the Federal Rules of Civil Procedure altogether) by failing to submit his complaints to the grievance process established by Duke for such matters. The pleadings establish that Duke followed its procedures, despite Giuliani's attempt to avoid them in favor of special meetings with administrators. (<u>See</u> Answer ¶¶ 95, 97-100.) Far from the victim of arbitrary or capricious treatment, the factual allegations show that he was afforded fundamental fairness.

> defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to plaintiff.

United Labs., Inc. v. Kuykendall, 322 N.C. 643, 661, 370 S.E.2d 375, 387 (1988). Giuliani's tortious interference claim fails at least three of these elements.

First, Giuliani's claim in tort must fail because there is no contract; consequently, there can be no claim for tortious interference. See Kuykendall, 322 N.C. at 661, 370 S.E.2d at 387; Cobra Capital, LLC v. RF Nitro Comm'ns, Inc., 266 F. Supp. 2d 432, 439 (M.D.N.C. 2003).

Second, even if such a contract existed, Giuliani's tortious interference claim fails because Coach Vincent was not a third person outside the alleged contract. Kuykendall, 322 N.C. at 661, 370 S.E.2d at 387 (tortious interference claim requires a "valid contract between the plaintiff and a third person"). Giuliani alleges that Coach Vincent "was acting at all relevant times in the course and scope of his employment with Duke University" as the Head Coach of the Men's Golf Team. (Compl. ¶ 90; see id. ¶ 3.) In short, Coach Vincent acted on behalf of Duke, a party to the alleged contract. A party cannot be liable for interfering with its own contract.

Third, even assuming that the contract existed, and that Coach Vincent somehow acted (in contrast to the Complaint's allegations) as a third party, Giuliani has failed to plead that Coach Vincent acted without justification. "The interference is 'without justification' if the defendants' motives for procuring termination of the . . . contract were 'not reasonably related to the protection of a legitimate business interest' of the

- 17 -

defendant." Privette v. Univ. of N.C., 96 N.C. App. 124, 134, 385 S.E.2d 185, 190 (1989) (quoting Smith v. Ford Motor Co., 289 N.C. 71, 94, 221 S.E.2d 282, 292 (1976)). If Coach Vincent had a lawful reason to induce the alleged breach of contract, he is exempt from liability – even if he acted maliciously. Childress v. Abeles, 40 N.C. 667, 675, 84 S.E.2d 176, 182 (1954); see also Sides v. Duke Univ., 75 N.C. App. 331, 346, 328 S.E.2d 818, 829 (1985), overruled on other grounds by Kurtzman v. Applied Analytical Indus., Inc., 347 N.C. 329, 331, 493 S.E.2d 420, 422 (1997) ("[T]he complaint in an action for malicious interference with contract must clearly allege that the actions of the defendant were the cause of the plaintiff's damages and that the complaint admits of no other motive for those actions than malice.").

The Complaint alleges that Coach Vincent was the coach of the team on which Giuliani claims a contractually guaranteed membership. (Compl. ¶ 3.) Coach Vincent had a legitimate professional interest in Giuliani's conduct and its effect on the team.[7] The Complaint shows a proper motive on its face, and Giuliani's tortious interference claim fails as a matter of law. See Privette, 96 N.C. App. at 134, 385 S.E.2d at 191 (no tortious interference claim by laboratory employee, because laboratory director had "an interest in insuring proper work procedures at the Center and, as such, had a legitimate professional interest in the plaintiff's performance of his duties").

---

[7] As the complaint acknowledges, Coach Vincent's legitimate professional interests in the golf team extend beyond Giuliani's contributions. (Compl. ¶ 17.) Plainly, a coach has a legitimate interest in the size of the team for which he is responsible.

- 18 -

### III.    **There Is No Claim for Affirmative Promissory Estoppel.**

Giuliani claims that even if he did not have a contract with Duke, he detrimentally relied on Duke's representations, and therefore is eligible to recover under a theory of promissory estoppel.  (Compl. ¶¶ 94-99.)  This claim faces an obstacle that cannot be overcome:    North Carolina does not recognize affirmative claims for promissory estoppel.  <u>Dealers Supply Co. v. Cheil Indus.</u>, 348 F. Supp. 2d 579, 587 (M.D.N.C. 2004) (<u>citing</u> <u>Home Elec. Co. of Lenoir, Inc. v. Hall & Underdown Htg. & Air Cond'ing Co.</u>, 86 N.C. App. 540, 544-45, 358 S.E.2d 539, 542 (1987)).  Accordingly, a promisee cannot use promissory estoppel to create contract obligations that otherwise would not exist.  <u>Id.</u>

Giuliani's fourth claim invokes promissory estoppel for precisely this impermissible purpose.  Because Coach Myers' promises allegedly induced him to act, Giuliani seeks to "enforce them by declaring Duke University in breach of the Contract." (Compl. ¶¶ 96, 98.)  In short, he asks the Court to enforce non-contractual promises on promissory estoppel grounds.  This Court has rejected similar claims under this theory, based on virtually identical language to that found in Giuliani's complaint.  <u>Dealers Supply</u>, 348 F. Supp. 2d at 586-87.    Having failed to plead the existence of an enforceable contract, Giuliani cannot use promissory estoppel to establish a claim for relief.  Accordingly, this claim fails as a matter of law.[8]

---

[8] Giuliani's promissory estoppel claim fares no better under New York law. Where, as here, a plaintiff's contract claim is barred by the statute of frauds, a promissory estoppel claim fails absent a showing of unconscionability.  <u>Marvin, Inc. v. Albstein</u>, 386 F. Supp. 2d 247, 253 (S.D.N.Y 2005).    Giuliani did not – and cannot – plead an unconscionable injury arising from his lack of access to free golf.

**IV.    Plaintiffs' Declaratory Judgment Claim Has No Merit.**

Giuliani's final claim seeks relief asking this Court to declare that Defendants' conduct violated the same rights asserted in his breach of contract claim:  A contract existed, Duke breached it, and Giuliani is entitled to recover.   (Compl. ¶ 105.) Defendants are entitled to judgment on this claim for the same reason that the contract claim fails:  Giuliani has not alleged the existence of an enforceable contract.  Shelton v. Duke Univ. Health Sys., Inc., 179 N.C. App. 120, 125, 633 S.E.2d 113, 117 (2006) (dismissing declaratory judgment claim because breach of contract claim failed).

**CONCLUSION**

If there is any case that should be ended with a judgment on the pleadings, it is this case.  Defendants are entitled to judgment on each of Plaintiff's claims for the reasons set forth above.

This 10th day of September, 2008.

/s/ J. Donald Cowan, Jr.
J. Donald Cowan, Jr.
N.C. State Bar No. 0968
Email:  don.cowan@elliswinters.com
Dixie T. Wells
N.C. State Bar No. 26816
Email:  dixie.wells@elliswinters.com
ELLIS & WINTERS LLP
100 N. Greene Street, Suite 102
Greensboro, North Carolina 27401
Telephone:  (336) 217-4193
Facsimile:  (336) 217-4198

/s/ James P. Cooney III
James P. Cooney III
N.C State Bar No. 12140

- 20 -

Email:  jcooney@wcsr.com
WOMBLE CARLYLE SANDRIDGE & RICE
One Wachovia Center, Suite 3500
301 South College Street
Charlotte, NC  28202
Telephone:  (704) 331-4980


Attorneys for Defendants Duke University and
Orrin Daniel Vincent III

## **CERTIFICATE OF SERVICE**

I hereby certify that on 10 September 2008, I electronically filed the foregoing Brief in Support of Motion for Judgment on the Pleadings with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Counsel for the Plaintiff
Robert C. Ekstrand
Email: rce@ninthstreetlaw.com

This 10th day of September 2008.

/s/ J. Donald Cowan, Jr.
J. Donald Cowan, Jr.

Attorney for Defendants Duke University and Orrin Daniel Vincent III