# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

HEATHER SUE MERCER,  )
  )
  Plaintiff,  )
  )
v.  )  1:97CV00959
  )
DUKE UNIVERSITY and  )
FRED GOLDSMITH,  )
  )
  Defendants.  )
_____ )

## MEMORANDUM OPINION

TILLEY, Chief Judge.

This case is now before the Court on several motions. For the reasons set forth below, the Defendants' Motion to Dismiss [Doc. #6] is GRANTED in part and DENIED in part; the Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction [Doc. #28] is DENIED; Defendant Duke University's Motion for Summary Judgment [Doc. #30] is GRANTED in part and DENIED in part; and Defendant Fred Goldsmith's Motion for Summary Judgment [Doc. #33] is GRANTED.[1]

I.

Taken in the light most favorable to Ms. Mercer, the non-moving party,[2] the

_____

[1] As a result of today's rulings, no claims remain against Mr. Goldsmith.

[2] With one exception, the issues before the Court are to be considered in the context of a summary judgment motion. When the Court considered the Defendant's motion to dismiss under Fed. R. Civ. Pro. 12(b)(6), it only looked to the facts as alleged on the face of Plaintiff's complaint.

facts are as follows: Plaintiff Heather Sue Mercer was a place-kicker on her high school football team. In August 1994 she enrolled at Defendant Duke University. In September 1994, she contacted the coaching staff of the Duke football team and told them of her desire to try out for the team. Apparently, Ms. Mercer had anticipated trying out the following spring, but Defendant Fred Goldsmith, the head coach, and Fred Chatham, the special teams coach, offered her a tryout that fall. The parties agree that Ms. Mercer did not kick well; Ms. Mercer contends that the tryout was a farce, designed to make her fail. At the conclusion of the tryout, Mr. Goldsmith indicated that Ms. Mercer could not, at that time, be a member of the team, but could serve as a manager while working out with the team's kickers and trying to improve. Ms. Mercer accepted this offer, and informed Mr. Goldsmith that she would try out for the team again in the spring.

Ms. Mercer served as a manager that fall, and then attended the team's winter conditioning drills. In the spring of 1995, Duke's top place-kicker from the previous season was out with a groin injury, and the emergency reserve kicker from the previous season was also out. The only healthy kickers were three walk-on hopefuls: Ms. Mercer, sophomore Pat Tillou, and freshman Ted Post. For present purposes, it is enough to say that there is a factual dispute about the relative skills of the three, with Ms. Mercer contending that she was the best, and the Defendants disagreeing.

The 1995 spring practice concluded with the annual Blue-White intrasquad

1

game. Ms. Mercer kicked the winning field goal, and after the game, Mr. Goldsmith told the press – and Ms. Mercer – that she was "on the team." This generated national media interest, although Ms. Mercer declined to conduct any interviews.

Several weeks later, in May 1995, Mr. Goldsmith told Ms. Mercer that she would not be invited to the team's summer camp that year. NCAA regulations limit the number of players that can attend such camps to 105. Mr. Goldsmith told Ms. Mercer that numerical considerations were the reason that she was not invited, although Ms. Mercer contends that Duke had never had 105 players attend summer camp, and did not have 105 players in camp in 1995. The Defendants contend that at least two other kickers were not invited to camp – Tillou and Jim Mills – while Ms. Mercer notes that Post was invited to the camp, even though, according to Ms. Mercer, she had outperformed him that spring.

In June 1995, Ms. Mercer wrote to Mr. Goldsmith, asking that she be allowed to attend summer camp if space opened up. In July 1995, Mr. Goldsmith called Ms. Mercer, and according to Ms. Mercer, reiterated that she would not be allowed to attend camp, and asked her why she was interested in football rather than beauty pageants.

In August 1995, when Ms. Mercer had returned to Duke to begin her sophomore year, Mr. Goldsmith invited Ms. Mercer and her mother to meet with him. He informed Ms. Mercer that she was still on the team, but that she would

2

not get pads or a uniform, would not dress for games, and would practice in shorts and a tee shirt, much as she had the previous year, when she had been a manager and not on the team. He allegedly made further comments, to the effect that her presence on the team could cause distracting media attention, and that a pretty girl like her should be cheerleading, not playing boys' games like football. This meeting was shortly followed by a press release stating that Ms. Mercer was on the "inactive roster," a limbo status that Ms. Mercer contends was without precedent in Duke history.

On August 25, 1995, Mike Cragg, Duke's Director of Sports Information required Mercer to attend a press conference. During that conference, Ms. Mercer read a press release in which she stated, "I believe that if I were a man and had the same kicking skills that I have now, I would be a member of the Duke football team." Mr. Cragg was present during Ms. Mercer's statement. As a result of that press conference, numerous articles appeared the next day in area newspapers.

In the fall of 1995, Nan Keohane, President of Duke University, received a phone call from David A. Hamburg. Mr. Hamburg informed Ms. Keohane that he had heard that Ms. Mercer was being excluded from the football team based on her gender. Ms. Keohane stated that she would investigate the situation.

Ms. Mercer's "inactive" status continued through the 1995 season. Ms. Mercer attended the winter conditioning program in 1996 and the 1996 spring practice. There were five kickers in spring practice. According to Ms. Mercer, she

3

was the third best, and was good enough to be the regular place-kicker for a Division I team. The Defendants contend that she was the worst. In any case, Ms. Mercer again was not invited to summer camp. When she returned to Duke in August 1996, Mr. Goldsmith cut her from the team. There is a factual dispute about whether, and why, other walk-on kickers were cut at approximately the same time. Ms. Mercer attempted to attend winter conditioning drills in early 1997, but Mr. Goldsmith took her aside, and asked her to leave. She did not return, although the Defendants allege that Mr. Goldsmith told her that she could try out for the team again during spring practice in 1997.

Around March 26, 1997, Plaintiff's counsel, Melinda Lawrence, wrote to Duke's University Counsel, informing them of Ms. Mercer's claim of disparate treatment in violation of Title IX. The instant action was filed on September 16, 1997. Ms. Mercer graduated from Duke in May 1998.

Ms. Mercer contends that her experience with Duke football reduced the value of the education for which she and/or her parents had paid $120,000, eliminated the value of the kicking camps she attended for several summers, prevented her from obtaining employment as a counselor at kicking camps, caused her emotional distress, and prevented her from focusing on her studies as she otherwise would have.

II.

Because it raises a jurisdictional question, the first matter the Court will

4

address is the Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction [Doc. #28].[3]

## A.

A federal court must have subject matter jurisdiction over a case before the case can be heard. See, e.g., American Fire & Cas. v. Finn, 341 U.S. 6, 18 (1951). There is a presumption against the existence of jurisdiction, which must be proven by the party seeking to have the case heard. See, e.g., Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982).

A defendant may challenge subject matter jurisdiction in two ways. "The defendant may argue that the allegations of the complaint are facially insufficient to sustain the court's jurisdiction....Alternatively, the defendant may contend that the plaintiff's jurisdictional allegations, though facially adequate, are factually untrue." Thigpen v. United States, 800 F.2d 393, 401 n. 15 (4th Cir. 1986) (overruled on other grounds by Sheridan v. United States, 487 U.S. 392 (1988)).[4] In the former situation, the court proceeds as it would on a Rule 12(b)(6) motion, by accepting as true the allegations of the complaint. In the latter case, however, the court must determine whether the factual attack involves the merits of the action. "When a

---

[3] The Defendants made this motion jointly, although the motion deals mainly with the Title IX claim, which Ms. Mercer asserts only against Duke.

[4] While Thigpen involved a Fed. R. Civ. P. 12(b)(1) motion and the Defendants in the instant matter have cited Fed. R. Civ. P. 12(h)(3) as the basis for their motion, both involve motions to dismiss for lack of subject matter jurisdiction. Therefore, the standard articulated in Thigpen is applicable to the instant matter.

Case 1:08-cv-00502-WO-WWD   Document 11-2   Filed 09/10/08   Page 7 of 30

factual attack on subject matter jurisdiction involves the merits of a dispute, '[t]he proper course of action for the district court...is to find that jurisdiction exists and deal with the objection as a direct attack on the merits of the plaintiff's case.'" U.S. v. North Carolina, 180 F.3d 574, 580 (4th Cir. 1999) (quoting Garcia v. Copenhaver, Bell & Assocs., 104 F.3d 1256, 1261 (11th Cir. 1997) (internal quotation marks omitted)). In so doing, the court may then consider evidence outside the pleadings to determine whether the facts support the jurisdictional allegations. Thigpen, 800 F.2d at 401, n. 15.

The first type of challenge to subject matter jurisdiction would be ineffectual in this case. Ms. Mercer's Complaint is facially adequate to support jurisdiction, because she has filed suit under Title IX. The Court has federal question jurisdiction over the Title IX claim, and supplemental jurisdiction over the Plaintiff's state law claims.[5] The Defendants are therefore challenging subject matter jurisdiction in the second of the two ways described above.

B.

Defendants have appropriately submitted materials outside the pleadings in support of their challenge. The Defendants contend that the Court lacks subject matter jurisdiction over this case because the Title IX claims are either moot or do not meet the requirements of Gebser v. Lago Vista Independent School District, 118 S. Ct. 1989 (1998).

---

[5] The Plaintiff does not claim that diversity jurisdiction exists.

6

Defendants first contention is that because the Plaintiff has now graduated from Duke, her request for injunctive and/or declaratory relief is moot. Plaintiff has acceded that no further issue remains as to the injunctive relief. (Mem. Opp'n Defs.' Mot. Dismiss Lack of Subj. Matter Jur'n [Doc. #40]). However, Defendants contend that because the request for injunctive relief is moot, Plaintiff's other Title IX claims are also moot. This proposition is contrary to Fourth Circuit law. Williams v. Spencer, 622 F.2d 1200, 1204 (4th Cir. 1980) (allowing damages claims to proceed after graduation of students had mooted claims for injunctive relief).

The Defendants next suggest that the Plaintiff's claim for damages cannot succeed under the standards articulated in Gebser v. Lago Vista Independent School District, 118 S. Ct. 1989 (1998). In other words, Defendants contest the facts which would be necessary in order to sustain a claim under Gebser. It is axiomatic that such a dispute goes to the merits of Ms. Mercer's claim or, in the least, is "intertwined" with the merits of the case. See generally Wright & Miller, Federal Practice and Procedure: Civil 2d § 1350 (discussing intertwining of jurisdictional and substantive issues). "In ruling on a jurisdictional motion involving factual issues which also go to the merits, the trial court should employ the standard applicable to a motion for summary judgment....(internal citation omitted) Therefore, the moving party should prevail only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law."

Case 1:08-cv-00502-WO-WWD   Document 11-2   Filed 09/10/08   Page 9 of 30

Augustine v. United States, 704 F.2d 1074, 1077 (9th Cir. 1983); see also Holt v. United States, 46 F.3d 1000 (10th Cir. 1995). The material jurisdictional facts are clearly in dispute here; thus, the Court will review the facts presented in order to determine whether there is sufficient evidence such that a jury could find that all the elements of Gebser have been met.

In Gebser, the Supreme Court held that a Title IX defendant cannot be held liable in damages merely "based on principles of respondeat superior or constructive notice." Id. at 1997. Rather, the Court focused on the need for actual notice by a person in a position of authority to remedy the alleged discrimination.

> [I]n cases like this one that do not involve official policy of the recipient entity, we hold that a damages remedy will not lie under Title IX unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond. . . . [M]oreover . . . the response must amount to deliberate indifference to discrimination.

Id. at 1999.[8]

Accordingly, in order to survive Defendant's motion, Plaintiff must provide facts to satisfy three elements; namely that 1) a person with authority to institute

---

[8] Plaintiff argues that the actual notice requirement of Gebser does not apply where official policy is at issue. Because the Court finds that there are sufficient facts such that a jury could find that Ms. Mercer has met all the requirements of Gebser, the Court need not address whether a policy is at issue and whether, in that event, Gebser would apply.

-8-

corrective measures; 2) had actual notice of the alleged discrimination; and 3) was deliberately indifferent to the alleged discrimination. Plaintiff maintains that several higher-ranking officials with the authority to address the alleged discrimination knew of the discrimination and failed to respond, thereby evincing deliberate indifference.

In particular, Ms. Mercer has offered an affidavit from David A. Hamburg in which he asserts that in the Fall of 1995, he telephoned Duke University President Nan Keohane, Duke's highest ranking official, and informed her that he had heard that Ms. Mercer was being discriminated against based on her gender. (Mem. Opp'n Defs.' Mot. Dismiss Lack of Subj. Matter Jur'n [Doc. #40], Ex. 3, (Hamburg Aff.) ¶ 4. According to Mr. Hamburg, Ms. Keohane said she would investigate the situation. Id. In response, Defendants do not contest that Ms. Keohane received that phone call. Rather, they allege that such notice was insufficient.

There is evidence that prior to that phone call, Ms. Mercer was required to attend a press conference on August 25, 1995 arranged and attended by Mike Cragg, Duke's Director of Sports Information. At that press conference, Ms. Mercer read a press release in which she stated, "I believe that if I were a man and had the same kicking skills that I have now, I would be a member of the Duke football team." (Mem. Opp'n Defs.' Mot. Dismiss Lack of Subj. Matter Jur'n [Doc.

9

#40], Ex. 1.[7]

Even if the notice Mr. Hamburg provided in his phone call was insufficient, had Ms. Keohane investigated, as Mr. Hamburg claims she promised to do, it is reasonable to infer that she would become aware, if she were not already, with the statements made by Ms. Mercer at the press conference. Therefore, there are facts that would sustain a jury's finding that a person in a position to remedy the alleged discrimination had actual knowledge of Ms. Mercer's claim. Because Plaintiff contends that she continued to be subjected to disparate treatment after Ms. Keohane had notice of her alleged discrimination, a jury could also find that Ms. Keohane was deliberately indifferent to the alleged discrimination. For these reasons, Defendants' motion to dismiss for lack of subject matter jurisdiction is denied.

III.

Having addressed the jurisdictional issue, the other pending motions will be resolved in the order in which they were filed. The next matter, then, is the Defendants' Motion to Dismiss [Doc. #6].

A.

---

[7]It should be noted that because Defendants' motion is being considered as a summary judgement motion, any evidence considered by the Court must comply with Fed. R. Civ. Pro 56(e) in that such facts must be set forth in a manner as would be admissible in evidence. Ms. Mercer's claims in her pleading that the release attached as Exhibit 1 was in fact, the same statement she read that day, satisfies this requirement.

10

The Defendants originally sought the dismissal of the Title IX claim, on the theory that Title IX does not apply to football and other contact sports. Although this Court agreed, the Fourth Circuit did not. See Mercer v. Duke Univ., 190 F.3d 643 (4th Cir. 1999). The Title IX claim therefore cannot be dismissed.

## B.

The Defendants have also requested that the negligent misrepresentation claim be dismissed for failure to comply with the pleading standards of Fed. R. Civ. P. 9(b), and under Fed. R. Civ. P. 12(b)(6). Because it is clear that the claim cannot survive the summary judgment stage, as discussed in Part V of this Memorandum Opinion, there is no need to resolve these issues, and the Defendants' motion on these points is denied as moot.

## C.

The Defendants also contend that the Plaintiff's breach of contract claim should be dismissed. Because it is clear that the claim cannot survive the summary judgment stage, as discussed in Part IV of this Memorandum Opinion, there is no need to resolve this issue, and the Defendants' motion on this point is also denied as moot.

## D.

Finally, Defendants claim that Plaintiff's constructive fraud claim should be dismissed because Plaintiff has failed to allege facts and circumstances that demonstrate 1) a confidential or fiduciary relationship between the parties, and 2)

11

how a position of trust was violated. Plaintiff did not address Defendants' request for dismissal of this claim in her Opposition to Defendants' Motion.

"In all averments...the circumstances constituting fraud...must be stated with particularity." Fed. R. Civ. Pro. 9(b). The original averments of constructive fraud in this complaint are : that Plaintiff placed her trust and confidence in Defendants, that Defendants were aware of a fiduciary duty to Plaintiff and encouraged her to place her trust in them, and that Defendants' actions constituted a breach of their duty to her.

To prove constructive fraud in North Carolina, a plaintiff must allege facts and circumstances "1) which created the relation of trust and confidence, and 2) [which] led up to and surrounded the consummation of the transaction in which defendant is alleged to have taken advantage of his position of trust to the hurt of plaintiff." Rhodes v. Jones, 232 N.C. 547, 548-49 (1950); Terry, 302 N.C. at 83. Plaintiff in this case did not aver sufficient facts with particularity to support her claim for constructive fraud. See Strum v. Exxon Company, USA, 15 F.3d 327, 331 (4th Cir. 1994). For these reasons, Defendants' motion to dismiss this cause of action is granted.

IV.

The next motion that was filed is Duke's motion for summary judgment.

A.

A moving party is entitled to summary judgment "if the pleadings,

12

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is appropriately granted when a party having the burden of proof on a particular claim is unable to produce admissible evidence that would be sufficient to support a jury verdict on each element of that claim. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986). In considering the motion, the district court must consider the evidence and reasonable inferences to be drawn from the evidence in the light most favorable to the non-moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 597-98 (1986).

B.

Duke has moved for summary judgment on the Plaintiff's contract claim. It is beyond cavil that the relationship between a university and its students is fundamentally "contractual in nature." Ralph D. Mawdsley, Litigation Involving Higher Education Employee and Student Handbooks, 109 Ed. Law Rep. 1031, 1033 (1996). Indeed, the North Carolina courts have recently recognized that "a student can bring an action for breach of contract arising from a dispute related to an educational contract." Ryan v. University of North Carolina Hosps., 494 S.E.2d 789, 790-91 (N.C. Ct. App. 1998) (internal quotation marks and citation omitted). However, the Ryan court made clear that such a suit can proceed only when the plaintiff can point to "an identifiable contractual promise" that has not been

13

honored. Id. at 791.

Ms. Mercer contends that Duke's nondiscrimination policy constitutes such a promise. This policy appears in Duke's student handbook and elsewhere. Some courts have held that information appearing in handbooks and other university publications are part of the contract between school and student. See, e.g., University of Texas Health Science Ctr. at Houston v. Babb, 646 S.W.2d 502, 505-06 (Tex. Ct. App. 1982) (finding student catalog to constitute a contract). Other courts, however, have taken a different view. See, e.g., Mahavongsanan v. Hall, 529 F.2d 448, 450 (5th Cir. 1976) (holding that requirements set forth in university publications can be changed without breaching the contract between school and student).

For present purposes, of course, the issue is not what the law of other jurisdictions may be, but rather what the law of North Carolina is. That is, the Court must determine whether Duke's publications were part of the contract between the school and Ms. Mercer under North Carolina law. Cf. Mawdsley, supra, at 1034 (noting, in the university context, that "[w]hether employee handbooks are part of employee contracts will vary among states"). The state courts have not yet spoken on this precise point.[8] However, they have repeatedly

_____

[8] This Court has faced this issue before, however. In Love v. Duke University, 776 F. Supp. 1070 (M.D.N.C. 1991), another judge of this Court concluded that "the academic bulletin is not a binding contract" between the school and its students. Id. at 1075.

14

considered the analogous issue of whether employee handbooks are part of the contract between employer and employee. The uniform answer has been that they are not, unless they are explicitly included by reference in the contract. See, e.g., Griffin v. Housing Authority of Durham, 303 S.E.2d 200, 201 (N.C. Ct. App. 1983). This rule has been applied both inside and outside the employment- at-will context. See Black v. Western Carolina Univ., 426 S.E.2d 733, 736 (N.C. Ct. App. 1993). Federal courts applying North Carolina law have followed this rule. See Harter v. Vernon, 953 F. Supp. 685, 694 (M.D.N.C. 1996).

These cases strongly suggest the proper resolution of this issue. This Court's job in applying state law is to "determine issues of state law as it believes the highest court of the state would determine them." Wright, Miller & Cooper, Federal Practice & Procedure: Jurisdiction 2d §4507, at 130. Although decisions of a state's intermediate appellate court need not be followed mechanically, see id. at 150-62, especially when they are not directly on point, they are valuable indicia of how the state's highest court would resolve an issue. Because the Griffin and Black decisions are the best evidence available of how the Supreme Court of North Carolina would handle the contract claim in the instant case, and because those decisions suggest that the contract claim should not be allowed to go forward, summary judgment must be granted on that claim.

C.

Duke also seeks summary judgment on the damages aspect of Ms. Mercer's

contract claim. Having granted summary judgment on the merits of the contract claim, it is not necessary to reach this contention, and it is denied as moot.

D.

Duke also seeks summary judgment on the merits of Ms. Mercer's Title IX claim. Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance," with a few exceptions not relevant here. 20 U.S.C. § 1681. Therefore, in order to establish a Title IX claim, a plaintiff must show (1) that she has been excluded from, denied the benefits of, or subjected to discrimination in an educational program; (2) that the program receives federal assistance; and (3) that she was excluded or discriminated against on the basis of her sex. See, e.g., Alston v. Virginia High School League, Inc., 176 F.R.D. 220, 223 (W.D. Va. 1997).

As to the first element, Ms. Mercer contends that she was "subjected to discrimination" while on the team, in that, for example, she was placed on "inactive" status in August 1995, was not issued pads, was not allowed to dress for games, and was not given much opportunity to practice.[9] She also contends that she was ultimately "excluded from" the Duke football team when she was cut in the autumn of 1996. Duke admits that she was cut from the team, and that

---

[9] Ms. Mercer points out that a discriminatory "failure to train" is actionable in the analogous context of Title VII. See, e.g., Pafford v. Herman, 148 F.3d 658, 667-68 (7th Cir. 1998).

16

while she was on the team, her status was in some ways unique. It contends that both of these facts were due to factors other than her sex. This contention is addressed below, under the third element of the prima facie case. The first element, for summary judgment purposes, is satisfied.

The second element is also satisfied. Duke admits that it receives federal assistance.

The crux of the case, then, is the third element. In order to determine whether a Title IX plaintiff was treated differently because of her sex, courts look to the proof schemes used in the Title VII context. See, e.g., Preston v. Commonwealth of Virginia ex rel. New River Community College, 31 F.3d 203, 207 (4th Cir. 1994). There are two basic approaches under Title VII. The first is variously called the "mixed-motive" approach, the "direct evidence" approach, or the "ordinary standards of proof" approach. This scheme is set forth in Justice O'Connor's concurrence in Price Waterhouse v. Hopkins, 490 U.S. 228 (1989). See generally Fernandes v. Costa Bros. Masonry, Inc., 199 F.3d 572, 580 (1st Cir. 1999) (explaining that, in Price Waterhouse, Justice O'Connor's concurrence was "the narrowest ground upon which a majority of the Justices supporting the judgment would agree," and is therefore the governing law).

The second approach is termed either the "pretext" approach or the "McDonnell Douglas burden-shifting proof scheme." Taylor v. Virginia Union Univ., 193 F.3d 219, 230 (4th Cir. 1999); see generally, e.g., Henson v. Liggett Group,

17

Inc., 61 F.3d 270, 274 (4th Cir. 1995) (setting forth elements of prima facie case under McDonnell Douglas). Plaintiffs are free to argue in the alternative, that is, to contend that they can show discrimination under either scheme. See, e.g., Fernandes, 199 F.3d at 581 ("A plaintiff . . . may elect to proceed simultaneously on both fronts."); EEOC v. Clay Printing Co., 955 F.2d 936, 943 (4th Cir. 1992) (allowing plaintiff to proceed in the alternative). However, the Court must, at the appropriate time, "channel the case into one format or the other." Fernandes, 199 F.3d at 581. The Fourth Circuit has recently spoken on how such a determination must be made:

> A plaintiff qualifies for the more advantageous standard of liability applicable in mixed-motive cases if the plaintiff presents direct evidence that the decision makers placed substantial negative reliance on an illegitimate criterion. Such a showing requires evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision. If the plaintiff satisfies this evidentiary threshold, the burden of persuasion shifts to the employer to prove that it would have reached the same determination without any discriminatory animus. The determination of whether a plaintiff has satisfied this evidentiary threshold is a decision for the district court after it has reviewed the evidence, which ultimately hinges on the strength of the evidence establishing discrimination.

Taylor, 193 F.2d at 232 (internal quotation marks and citations omitted); see also Fernandes, 199 F.3d at 580.

Evidence meeting the Taylor standard is present in the case at bar. According to Ms. Mercer, Mr. Goldsmith telephoned her in July 1995 to reaffirm that she was not welcome at the summer workouts that year. Her exclusion from

18

these workouts is a "contested . . . decision," and Mr. Goldsmith's "alleged discriminatory attitude" may be inferred from the comments that Ms. Mercer claims he made at that time, such as asking Ms. Mercer why she was interested in football, and suggesting that she "participate in beauty pageants instead."

A similar incident allegedly occurred in August 1995, when Mr. Goldsmith told Ms. Mercer that her status on the team in the fall of 1995 would be limited to shagging balls without pads or a uniform. This, too, is a contested decision, and at the time it was communicated to Ms. Mercer, it was allegedly accompanied by remarks to the effect that Ms. Mercer was "pretty" like actress Molly Ringwald, that she should not be interested in "little boys' games," and that she should take up "cheerleading" instead of football. Although Duke characterizes these as "stray remarks," they are not.[10] They are comments made by the decision maker (Mr. Goldsmith), to the person affected (Ms. Mercer), at the time of the challenged actions. Moreover, they were made on two separate occasions. This fits the profile described in Taylor. See also Clay Printing Co., 955 F.2d at 942 (requiring a "nexus . . . between the alleged discriminatory statements and . . . the [challenged]

_____

[10] Duke also contends that these remarks are not sexist. The Court simply disagrees. They reflect outdated sexual stereotypes. Equally, if a coach were to ask an Asian-American athlete why he was interested in football, and why he didn't grow bonsai trees or practice karate instead, there could be no doubt that such remarks reflected racial bias. Duke notes that Ms. Mercer's mother characterized the remarks as "bizarre" rather than "offensive." (Diana Mercer Dep., at 46.) The value of such a characterization is not explained; for what it is worth, Ms. Mercer herself stated that she regarded the remarks as both "offensive" and "sexist." (Heather Sue Mercer Dep., vol. III, at 306.)

Case 1:08-cv-00502-WO-WWD   Document 11-2   Filed 09/10/08   Page 21 of 30

employment decisions"); cf. Browning v. President Riverboat Casino-Missouri, Inc., 139 F.3d 631, 633-34 (8th Cir. 1998) (finding support for jury verdict under direct evidence approach where black supervisor said "that white boy [the employee] better learn who he's messing with"); Wilhelm v. Blue Bell, Inc., 773 F.2d 1429, 1433-44 (4th Cir. 1985) (finding "ample direct evidence" of age discrimination where decision maker said that "younger salesmen do a much better job than you older fellows" and that "[y]ou older fellows . . . run out of steam").

This analysis is not changed by the fact that it was Mr. Goldsmith that initially told Ms. Mercer that she was "on the team." The Fourth Circuit has held that "when the individual who hires an employee is the same person who discharges him only a few months later, a strong inference arises that discrimination was not a determining factor for the adverse action." Mitchell v. Data General Corp., 12 F.3d 1310, 1318 (4th Cir. 1993) (citing Proud v. Stone, 945 F.2d 796, 797-98 (4th Cir. 1991)). Duke argues that because Mr. Goldsmith "hired" Ms. Mercer by putting her on the team, there is an inference that his decisions to limit her status on the team, and to dismiss her from the team, were not motivated by her sex.

The primary problem with this contention is that Mr. Goldsmith did not unequivocally put Ms. Mercer on the team. Apparently, he told her that she was on the team at the end of spring practice. Just three months later, before summer workouts began, he told her that she was not welcome at the summer workouts.

20

And that fall, he placed her on inactive status. No strong inference can arise from the fact that she was put "on the team" for a limited time and in a limited capacity.

A secondary problem is that Duke's argument ignores the plausible argument that Mr. Goldsmith's attitude towards having a woman on the team changed between the time he put her on the team and the time he limited her role. The Proud inference of nondiscrimination only makes sense because a decision maker's attitudes about prohibited factors such as sex are likely to remain constant over relatively short periods of time. But Mr. Goldsmith may have had, or may have thought he had, good reason to change his attitude. He admits that an unexpected "media frenzy" followed the decision to put Ms. Mercer on the team. He also admits that he viewed the media interest generated by Ms. Mercer's presence on the team as a distraction, and as a possible hindrance to Duke's recruiting efforts.

Because Ms. Mercer has presented direct evidence that her sex was a factor in some of the decisions she challenges, this case may proceed within the Price Waterhouse/direct evidence framework. The same evidence that makes this a direct evidence case defeats Duke's motion for summary judgment. Indeed, given that a case is channeled into the Price Waterhouse framework only after a court "has reviewed the evidence," and has found "the strength of the evidence establishing discrimination" to be adequate, summary judgment is unlikely to be appropriate in such cases. Taylor, 193 F.2d at 232. To quote a case cited by Duke, an essential inquiry in discrimination cases is into the "perception of the

21

decision maker." DeJarnette v. Corning, Inc., 133 F.3d 293, 299 (4th Cir. 1998) (internal quotation marks and citations omitted). That inquiry, for summary judgment purposes, is ended when the decision maker makes statements evincing gender bias at the time he communicates his decisions to those affected by them.

E.

Duke also seeks summary judgment on the Plaintiff's request for damages under Title IX. Its argument is one paragraph long, and it cites just one case, from a distant circuit.[11] The gist of the position, however, is that Duke sees Ms. Mercer as alleging a "deprivation . . . relate[d] to an activity removed from the ordinary educational process." Alexander v. Yale Univ., 631 F.2d 178, 184 (2d Cir. 1980) (quoted in Duke's brief).[12] According to Duke, therefore, Ms. Mercer cannot obtain damages without pleading her injuries in great detail.

She has, however, pled damages with adequate specificity. The type of money damages available under Title IX has received surprisingly little attention since the Supreme Court first determined that money damages were available in this area. See Franklin v. Gwinnett County Public Schools, 503 U.S. 60 (1992) (holding that money damages are available under Title IX and refusing to limit those damages to back pay). However, what little authority there is suggests that the

---

[11] Ms. Mercer's response is equally underdeveloped.

[12] The Alexander court did not intend to bar claims arising outside the classroom. See Alexander, 631 F.2d at 184 ("This is not to say that exclusion of all members of one sex from all extra-curricular activities would not give rise to palpable injuries which could be redressed by the courts.")

22

damages that Ms. Mercer asserts – for example, emotional distress – are cognizable under Title IX. See, e.g., Wright v. Mason City Community Sch. Dist., 940 F. Supp. 1412, 1414 (N.D. Iowa 1996) (apparently finding that damages for emotional distress are recoverable under Title IX). She has asserted those damages with ample precision to satisfy the Court that there is "concrete adverseness" between the parties. Alexander, 631 F.2d at 185. Therefore, Duke's motion for summary judgment on the damages aspect of Ms. Mercer's Title IX claim must be denied.

## V.

The final motion to be addressed is Mr. Goldsmith's motion for summary judgment. The legal standard applicable to the motion has been set forth above.

### A.

Mr. Goldsmith first contends that he is entitled to summary judgment on the Title IX and contract claims. The Plaintiff says that she "does not assert" those claims against Mr. Goldsmith, and this contention is consistent with the language of the Complaint. Therefore, Mr. Goldsmith's motion is granted as to the Title IX and contract claims.

### B.

The remainder of Mr. Goldsmith's motion deals with the negligent misrepresentation claim, the only claim the Plaintiff is pressing against him. Mr. Goldsmith argues that the tort of negligent misrepresentation applies only to

23

business transactions, and that the alleged misrepresentations here did not concern a business transaction. Because this contention is correct, the Court finds it unnecessary to address Mr. Goldsmith's other arguments.

The Supreme Court of North Carolina's seminal opinion in this area is Raritan River Steel Co. v. Cherry, Bekaert & Holland, 367 S.E.2d 609 (N.C. 1988). The issue there was the scope of an accountant's liability to the creditors of the accountant's client for negligent misrepresentations made in audit reports regarding the client. The court answered the question by adopting the position of the Restatement (Second) of Torts § 552 (1977). The Restatement imposes liability on "[o]ne who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions," if he does so negligently and the other person justifiably relies on the false information.

The Restatement definition of negligent misrepresentation, then, includes a requirement that the misrepresentation take place in a business setting. The Plaintiff here seeks to avoid that requirement. She argues that the Raritan court adopted the Restatement definition only for cases involving accountants' liability, and supports this by noting that the court stated that "[w]e conclude that the [Restatement standard] represents the soundest approach to accountants' liability for negligent misrepresentation," Raritan, 367 S.E.2d at 617, and also stated that "[t]he tort of negligent misrepresentation occurs when a party justifiably relies to

24

his detriment on information prepared without reasonable care by one who owed the relying party a duty of care," id. at 612, making no reference to business matters.

If it were simply a matter of interpreting Raritan, there would indeed be room for doubt about whether negligent misrepresentation is actionable only in the business setting. But the inquiry does not end with Raritan. As noted above, a federal court must determine issues of state law as it believes the highest court of the state would determine them. See generally Hatfield v. Palles, 537 F.2d 1245, 1248 (4th Cir. 1976). And in making this determination, "[i]f the . . . state's highest court has not ruled on a particular issue, the decisions of the intermediate appellate court . . . of that state constitute the next best indicia of what state law is." Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction 2d § 4507. The Court of Appeals of North Carolina has read Raritan as adopting the Restatement view of negligent misrepresentation in its entirety. See, e.g., Middleton v. The Russell Group, Ltd., 483 S.E.2d 727, 743 (N.C. Ct. App. 1997) (stating that "in Raritan . . . our Supreme Court expressly adopted the standards for liability in negligent misrepresentation actions set forth in the Restatement," and holding that the Restatement measure of damages should also be used); Forbes v. Par Ten Group, Inc., 394 S.E.2d 643, 647-48 (N.C. Ct. App. 1990) (quoting the

25

Restatement outside the accountants' liability context).[13] Commentators have come to the same conclusion. See, e.g., David A. Logan & Wayne A. Logan, North Carolina Torts 548 (1996) (stating that "North Carolina, following the Restatement" recognizes the tort of negligent misrepresentation, and that one of the elements is that the misrepresentation be in the course of both the plaintiff's and the defendant's business).

Ms. Mercer argues that even if the tort of negligent misrepresentation applies only to business transactions, both she and Mr. Goldsmith had a pecuniary interest in Duke football, and his alleged misrepresentations to her are therefore actionable. The Court agrees that the alleged misrepresentations were made within the "course of [Mr. Goldsmith's] business, profession or employment," Restatement (Second) of Torts § 552 (1977), but not that they were made "for the guidance of [Ms. Mercer] in [her] business transactions," id.

The Restatement equates business transactions with commercial matters.

---

[13] The Plaintiff contends that Fulton v. Vickery, 326 S.E.2d 354 (N.C. Ct. App. 1985) "recognized the availability of a negligent misrepresentation claim" in a non-commercial setting. (Resp. to Def. Goldsmith's Mot. for Summ. J. [Doc. #38], at 5.) However, the Fulton court never addressed that issue. Rather, it held that the representations at issue in that case had been made non-negligently. In setting out the elements of a negligent misrepresentation claim, the court stated: "The tort of negligent misrepresentation occurs when in the course of a business or other transaction in which an individual has a pecuniary interest, he or she supplies false information for the guidance of others in a business transaction, without exercising reasonable care." Id. at 358 (emphasis added). Even if Fulton were contrary to the Restatement, however, it would be of limited value to this Court, because it was decided before Raritan.

26

The Comment to the Restatement definition of the tort indicates that the tort deals with false "commercial information . . . [and with the] . . . liability . . . of a supplier of information to be used in commercial transactions." Restatement (Second) of Torts § 552, cmt. a (1977) (emphases added). Moreover, negligent misrepresentation has been recognized by the North Carolina courts in commercial settings. See, e.g., Raritan, 367 S.E.2d 609 (dealing with liability of accountants for errors in audited financial statements); Brown v. Roth, 514 S.E.2d 294 (N.C. Ct. App. 1999) (dealing with liability of real estate agency to purchaser of real estate).[14]

The instant case simply is not commercial litigation. Ms. Mercer, in an attempt to show otherwise, points to some pecuniary losses that she has allegedly suffered as a result of the claimed misrepresentations. For example, she states that she paid tuition to Duke in reliance on Mr. Goldsmith's statements, and she contends that her job prospects have suffered, because her academics suffered due to the amount of time she spent on football, which she would not have done absent Mr. Goldsmith's alleged statements. There are problems with each of these arguments. The first fails to recognize that Ms. Mercer decided to attend Duke before Mr. Goldsmith made any statements at all to her, and that she decided to

---

[14] By contrast, in some other jurisdictions, negligent misrepresentation is not merely a business tort, and courts have allowed plaintiffs to proceed even when no "business transactions" were affected. See, e.g., Mallette v. Chilren's Friend and Service, 661 A.2d 67 (R.I. 1995) (allowing adoptive parents to proceed against adoption agency on negligent misrepresentation theory).

27

stay after it had become clear that she had no meaningful place on the football team. The second may be too speculative. See, e.g., Fortune v. First Union Nat'l Bank, 371 S.E.2d 483, 485 (N.C. 1988) (stating that damages must be provable with reasonable certainty). But the overarching problem with both contentions is that Ms. Mercer's relationship to Duke football was not fundamentally a business relationship. It may have had some collateral economic consequences, but it was essentially unlike the purchase of real estate or the issuance of a loan based on audited financial information. For that reason, the business tort of negligent misrepresentation is not available to Ms. Mercer, and summary judgment on this claim must be granted.

VI.

For the reasons set forth above, the Defendants' Motion to Dismiss [Doc. #6] is GRANTED in part and DENIED in part; the Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction [Doc. #28] DENIED; Defendant Duke University's Motion for Summary Judgment [Doc. #30] is GRANTED in part and DENIED in part; and Defendant Fred Goldsmith's Motion for Summary Judgment [Doc. #33] is GRANTED.

This the 28 day of ~~May~~ September, 2000.

_United States District Judge_

28