IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
No. 1:08-cv-502

| | |
|---|---|
| ANDREW GIULIANI, | ) |
| Plaintiff, | ) |
| v. | ) |
| DUKE UNIVERSITY and ORRIN DANIEL VINCENT III, | ) |
| Defendants. | ) |

**BRIEF OF AMICI EDWARD C. CARRINGTON *ET AL.* IN SUPPORT
OF PLAINTIFF'S OBJECTIONS TO THE MAGISTRATE
JUDGE'S REPORT AND RECOMMENDATIONS**

Plaintiff, Andrew Giuliani, claims that Defendants, Duke University and Orrin Daniel Vincent III, breached various contract and tort duties owed to Giuliani. The magistrate judge issued a report recommending that this Court grant Defendants' motion for judgment on the pleadings against Giuliani. Amici respectfully submit this brief in support of Giuliani's objections to the magistrate judge's recommendation.

**AMICI'S IDENTITY AND INTEREST**

Amici, Edward C. Carrington *et al.*, were members of the Duke lacrosse team (or their parents) when team members were falsely accused of raping a woman at a party in March 2006. Although Amici were not indicted, they were the object of intense and protracted attention—as well as abusive and illegal mistreatment—by police investigators, the University, the community, and the media. These events prompted Amici to file a complaint against Duke University, various Duke administrators and officers, and others. *See Carrington v. Duke University*, No. 08-119 (M.D.N.C.).

Amici asserted a number of counts, one of which is pertinent to this case. In Count 15, Amici seek to hold the University liable for breaching several contractual promises it made to them: (1) the University failed to implement and enforce its anti-harassment commitment as set forth in its 2005-06 Undergraduate Bulletin, the Faculty Handbook, and other University publications; (2) the University failed to afford Amici various procedural rights guaranteed in the Bulletin; (3) the University cancelled the lacrosse team's season and fired its coach in bad faith and for illegitimate reasons; (4) the covenant of good faith and fair dealing. Duke University and the other defendants moved to dismiss Amici's complaint. Those motions are now fully briefed and awaiting decision.

Amici have a significant interest in the outcome of this case because Amici's complaint, like Giuliani's, claims that Duke University was contractually bound by terms set forth in the Student Bulletin and other University publications—particularly the anti-harassment and procedural-safeguards provisions—by terms stated by the coach as an inducement to enroll, and by the covenant of good faith and fair dealing. Amici respectfully contend that the magistrate judge erred in concluding that such terms are not contractually binding upon the University, and that the Court should therefore decline to adopt the magistrate judge's Report and Recommendation to the extent it depends upon the determination that there was no valid contract. Amici believe their brief will assist the Court in resolving the pending motion for judgment on the pleadings in this case by providing the Court with additional analysis of the key legal issue—whether Defendants were subject to any contractual obligations—beyond what Giuliani provides the Court in his brief.

# BACKGROUND[1]

Andrew Giuliani is a student at Duke University. Rod Myers, the former head coach of the Duke men's golf team, "aggressively recruited Andrew to Duke." Complaint, Doc. 1 ("Compl.") ¶ 11. Knowing that Andrew would select the school that "would provide him with the best preparation to achieve his dream" of "becom[ing] a professional golfer," Compl. ¶ 12, Myers "focused Andrew's attention on the University's 'state-of-the-art' training facilities[,] which were 'second to none' and were for the exclusive use of the men's and women's golf teams," Compl. ¶ 13. Myers "emphasized to Andrew that he would be given life-time access to those training facilities as an alumnus of the Duke Golf Program" and "assured Andrew that, if he matriculated to Duke, he would have the opportunity to compete with his teammates to earn spots in the most competitive tournaments against the most talented players in the NCAA." Compl. ¶ 13. "Andrew decided to accept Duke University's offer to enroll based in material part upon the[se] promises." Compl. ¶ 14. Upon enrollment, Andrew would owe Duke "roughly $200,000 in tuition and fees." Compl. ¶ 15. In exchange for paying tuition and fees, Duke "promised to provide Andrew an array of educational services, the opportunity to participate in the University's intercollegiate golf program, and lifetime access to the University's 'state-of-the-art' golf training facilities." Compl. ¶ 59.

After Myers died in the spring of 2007, defendant Vincent became the head coach of the golf team. Compl. ¶ 14. In February 2008, Vincent "announced to the team that he was unilaterally cancelling Andrew's eligibility to participate in the University's Athletics Program immediately and indefinitely"—that is, Vincent suspended Giuliani from the team. Compl. ¶ 18. As justification for his decision, Vincent cited several recent incidents in which Andrew

---

[1] Amici assume the truth of the allegations in Giuliani's complaint.

allegedly behaved badly, such as "flipp[ing] his putter," "'throwing and breaking' a club," and "toss[ing]" an apple at a teammate's face. Compl. ¶ 19. Giuliani alleges that Defendants "fabricated" these "charges." Compl. ¶ 20 (quotation marks omitted).

Vincent then decided that Giuliani's suspension would be permanent "unless every single one of [Giuliani's] twelve teammates wrote a letter to O.D. Vincent that O.D. Vincent deemed 'satisfactory' supporting Andrew's reinstatement to the team and explaining the reasons why." Compl. ¶ 21. Giuliani then met with the nine returning team members, eight of whom "expressly assured Andrew that they supported [his] return to the team." Compl. ¶ 28. But Vincent, Giuliani alleges, manipulated the process. For example, Vincent instructed team members "not to write their letters until they 'heard more from Andrew,'" but instructed Giuliani "to 'back off' and limit his contacts with his teammates." Compl. ¶ 30. Vincent also let it be known that he wanted to "drastically cut the size of the team roster." Compl. ¶ 31. Thus afraid that "their positions on next year's roster were also in jeopardy," the remaining players' "personal interests were directly in conflict with Andrew's reinstatement to the team." Compl. ¶ 31-32.

Vincent imposed another condition upon Giuliani's return to the team: Giuliani would have to "re-qualify" for the team even though all other returning varsity players who had participated in a tournament the prior season were exempt from having to re-qualify. Compl. ¶ 33 (quotation marks omitted). But Vincent offered Giuliani an exemption if he "agreed to certain 'parameters.'" Compl. ¶ 34. Vincent presented his parameters to Giuliani in the form a "waiver agreement," by which Giuliani was to waive, among other things, any right to know about any "correspondence" between his teammates and Vincent regarding his eligibility. Compl. ¶¶ 36, 41. Andrew refused to sign the waiver agreement. Compl. ¶¶ 39-40, 42.

Five teammates subsequently "notif[ied] Andrew that they had decided that Andrew's

4

membership on the team should be terminated." Compl. ¶ 43. Giuliani's parking and greens privileges were revoked, although Vincent did not directly inform Giuliani that he had been permanently removed from the team. Compl. ¶¶ 43-44.

After his eligibility was terminated, Giuliani "sought a meeting with the Interim Athletic Director, Dr. Christopher Kennedy," who "initiated an investigation of the matter, meeting with six team members as a group and separately with Andrew for approximately ten minutes." Compl. ¶ 45. When Vincent learned that Kennedy intended to meet again with Giuliani and his teammates outside the presence of the coaches, Vincent "directed [team members] to confront Andrew publicly, which they did that same day, in a public area near O.D. Vincent's office, where they harassed and attempted to intimidate Andrew" by "shout[ing] obscenities at him, … demand[ing] that [he] cease his attempt to restore his own eligibility, and warn[ing] [him] that they would wield the power that O.D. Vincent had delegated to them to ensure that Andrew would never play competitive NCAA golf again unless he transferred to a different school." Compl. ¶¶ 46, 66.

"Shortly thereafter, Kennedy's investigation was shut down by Pamela Bernard, the University's General Counsel," in favor of the General Counsel's "own investigation into the matter." Compl. ¶ 48. Deputy General Counsel Kate Hendricks had responsibility for the investigation, but, the complaint alleges, her investigation was a "sham." Compl. ¶¶ 49-51. Hendricks concluded that Vincent's conduct and "termination of Andrew's eligibility was 'within the significant authority of the coach,'" and that Giuliani's "only option was to pursue a grievance procedure conducted by an administrator who must defer to [the general counsel] on such questions." Compl. ¶ 52.

In this action, Giuliani brings five counts. In Count I, Giuliani claims that Defendants

5

breached several contractual duties owed him. According to Giuliani, many of the specific provisions of the contract at issue are contained in the the Duke University Student Bulletin, the Duke University Student-Athlete Handbook, the Duke University Athletic Department Policy Manual, and the 2007-08 NCAA Division I Manual. Compl. ¶ 60. First, the contract provides that Giuliani (like other students) would not be subjected to harassment by University faculty, staff, and students. Compl. ¶ 66. Second, the contract provides that Giuliani's right to participate in the golf program and to access its facilities could be cancelled or terminated only under certain limited circumstances, none of which obtained. Compl. ¶¶ 62-64. Third, the contract affords Giuliani (like other students) certain procedural "safeguards," including: that Giuliani would receive notice of the allegations upon which his eligibility was to be cancelled; that Vincent would "consult with the Director of Athletics before he unilaterally suspended and before he unilaterally terminated Andrew's eligibility"; that Vincent would not "delegate[] authority to terminate Andrew's eligibility to each and every one of his teammates"; that a student would receive notice of the charges and an opportunity to be heard before being disciplined; that a student would not be "depriv[ed] of [his] rights under the Contract" by "biased or potentially conflicted decision makers, much less decision makers with a personal, vested interest in the decision"; and that a student would be deprived of his rights only if all previously defined conditions of such punishment were satisfied. Compl. ¶¶ 66-72. Giuliani claims that Defendants violated each of these contractual duties. Compl. ¶¶ 24, 67, 73.

In Count II, Giuliani claims that Defendants breached the covenant of good faith and fair dealing implicit in the contract between him and Duke by, for example, retaliating against Giuliani's exercise of his contractual rights. Compl. ¶¶ 82-83. In Count III, Giuliani claims that Vincent tortiously interfered with the contract between him and Duke. Compl. ¶ 88. In Count

6

IV, Giuliani claims that his reliance upon Myers' recruiting promises estops Duke from denying Giuliani the opportunity to participate in the golf program and to use the program's facilities. Compl. ¶¶ 95-99. In Count V, Giuliani seeks a declaration that there is a "valid and enforceable" contract between him and Duke and that the conduct described above violated that contract. Compl. ¶¶ 102-05.

Defendants moved for judgment on the pleadings. The magistrate judge concluded that Count I fails because there was no valid and enforceable contract between Giuliani and Defendants that was breached. In particular, the magistrate judge determined that "student policy manuals are not binding contracts." Memorandum, Opinion, Recommendation, and Order, Doc. 23 ("R&R") at 6-8. With no valid, enforceable contract between Giuliani and Defendants, the magistrate judge concluded, the remaining counts could not stand, either. R&R at 9-11.

## ARGUMENT

There is national consensus that "the basic legal relation between a student and a private university or college is contractual in nature [and that] [t]he catalogues, bulletins, circulars, and regulations of the institution made available to the matriculant become a part of the contract," as does a duty to act in good faith. *Ross v. Creighton Univ.*, 957 F.2d 410, 416 (7th Cir. 1992) (quotation marks omitted); *see, e.g.*, *Mangla v. Brown Univ.*, 135 F.3d 80, 83 (1st Cir. 1998); *Alsides v. Brown Inst., Ltd.*, 592 N.W.2d 468, 472-74 (Minn. Ct. App. 1999); *Bleicher v. University of Cincinnati College of Med.,* 604 N.E.2d 783, 787-88 (Ohio Ct. App. 1992); *Gally v. Columbia Univ.*, 22 F. Supp. 2d 199, 206-07 (S.D.N.Y. 1998); *see also Gallimore v. Daniels Constr. Co.*, 338 S.E.2d 317, 319 (N.C. Ct. App. 1986) ("Every contract or agreement implies good faith and fair dealing between the parties to it ….").

North Carolina law accords with this national consensus: in *Mercer v. Duke University*, the court concluded that it is "beyond cavil that the relationship between a university and its students is fundamentally 'contractual in nature.'" No. 97-959, Slip op. at 13 (M.D.N.C. Sept. 28, 2000) [Ex. A].[2] It does not matter whether the university's bulletin and other publications, standing alone, would suffice to constitute a valid contract; the contract may be formed in fact when the student agrees to pay tuition and fees and to abide by rules stated in the bulletin and other university publications in exchange for the opportunity to take classes, participate in activities, and obtain a degree, as well as for the school's promise to adhere to the terms stated in the bulletin and other university publications. *See Snyder v. Freeman*, 266 S.E.2d 593, 602 (N.C. 1980) ("A 'contract implied in fact' ... arises where the intention of the parties is not expressed, but an agreement in fact, creating an obligation is implied or presumed from their acts, or, as it has been otherwise stated, where there are circumstances which, according to the ordinary course of dealing and the common understanding of men, show a mutual intent to contract."); *Creech v. Melnik*, 495 S.E.2d 907, 911 (N.C. 1998) ("an implied [in fact] contract is as valid and enforceable as an express contract. Except for the method of proving the fact of mutual assent, there is no difference in the legal effect of express contracts and contracts implied in fact."). Surely, Duke could not accept a student's tuition but refuse to enroll the student and yet keep the tuition – such conduct would obviously breach Duke's contractual obligations to the student.

To be sure, in North Carolina, as in other jurisdictions, courts disfavor claims that require

---

[2] Contrary to Defendants' suggestion, the Fourth Circuit did not hold in *Tibbetts v. Yale Corp.*, 47 Fed. Appx. 648 (4th Cir. 2002), that a "university's student policy manuals are not contracts," Br. in Supp. of Defs.' Mot. for J. on the Pleadings (Doc. 11) at 10; rather, applying Virginia law, it held only that, under the circumstances, a particular section of the student handbook was not binding, 47 Fed. Appx. at 656.

8

"inquiry into the nuances of educational processes and theories" or into whether the education provided "was not good enough," but courts in North Carolina will make "an objective assessment of whether the institution made a good faith effort to perform on its promise" if that promise is "specific." *Ryan v. University of N.C. Hosps.*, 494 S.E.2d 789, 791 (N.C. Ct. App. 1998) (quotation marks omitted) (University of North Carolina was contractually bound by the "Essentials of Accredited Residencies" "to provide a one month rotation in gynecology" to a graduate medical student); *see also Alsides*, 592 N.W.2d at 472-74; *Ross*, 957 F.2d at 416-17; *Gally*, 22 F. Supp. 2d at 207. And, as noted, the University is bound by the covenant of good faith and fair dealing. Further, "[t]he proper standard for interpreting the contractual terms is that of reasonable expectation—what meaning the party making the manifestation, the university, should reasonably expect the other party to give it." *Mangla*, 135 F.3d at 83 (quotation marks omitted).[3]

Under these principles, Defendants were contractually bound by the Bulletin and other publications in the ways Giuliani claims. Giuliani does not claim that the University failed to provide an education that was "good enough." Rather, Giuliani claims that Defendants failed to follow through on a collection of specific non-academic promises, such as the anti-harassment and procedural guarantees governing disciplinary matters set forth in the Student Bulletin and other University publications. *See, e.g.*, *Ross*, 957 F.2d at 416 ("the catalogues, bulletins, circulars, and regulations of the institution made available to the matriculant become a part of the contract") (quotation marks omitted); *Havlik v. Johnson & Wales Univ.*, 509 F.3d 25, 35 (1st Cir. 2007) (under Rhode Island law, "the [student] handbook designates the rudimentary contractual

---

[3] Whether a school made a specific and therefore enforceable promise is a question of fact. *See Ryan*, 494 S.E.2d at 791; *Ross*, 957 F.2d at 417; *Mangla*, 135 F.3d at 83-84.

9

terms between the parties vis-a-vis the appeal process" in disciplinary matters); *Atria v. Vanderbilt Univ.*, 142 Fed. Appx. 246, 255 (6th Cir. 2005) (under Tennessee law, "disciplinary action by the university" is not "academic" and therefore disciplinary procedures specified in handbook bound university).

Defendants emphasized in their brief to the magistrate judge the "traditional judicial deference toward the internal operations of a university concerning its relationship with students." Br. in Supp. of Defs.' Mot. for J. on the Pleadings at 12. Amici do not deny the validity or importance of that general principle, but, as *Ryan* and other decisions discussed above establish, that principle must yield when a specific promise or the covenant of good faith and fair dealing is at issue. Indeed, by creating and promulgating policies in the Bulletin and other publications, the University has already determined for itself how it will operate; Giuliani merely seeks to hold the University to its word. Moreover, tolerating or encouraging harassment and biased disciplinary decisions could hardly be considered legitimate exercises of the University's operational prerogatives.

The magistrate judge's analysis misses the mark in several respects. First, the magistrate judge concluded that "[n]on-binding student policy manuals are not binding contracts." R&R at 6. Besides begging the question, the magistrate judge's proposition is irrelevant insofar as Giuliani alleges that the Bulletin and other publications merely express terms of a contract rather than themselves constitute the contract. Giuliani explained in his brief to the magistrate judge that he "is not alleging that the Bulletins themselves are the Contract, but [rather] that elements of the Contract are evinced in the documents which contain, among other things, the terms of the agreement." Pl.'s Opp'n to Defs.' Mot. for J. on the Pleadings (Doc. 14) at 10. Giuliani was drawing on authorities such as those cited above, which establish that the relationship between

10

university and student is fundamentally contractual and that university publications such as a student bulletin express promises that may bind the university even if the publication standing alone would not suffice to establish a contractual relationship.

The magistrate judge rejected Giuliani's description of his claim because, in the magistrate judge's view, Giuliani's complaint had instead alleged that the Bulletin and other publications themselves are binding contracts. *See* R&R at 6. Thus, the magistrate judge said, Giuliani was improperly "attempt[ing] to change arguments between the complaint and the brief." R&R at 6. With due respect to the magistrate judge, Giuliani's complaint adequately alleges a contractual relationship whose terms are expressed in part through the Student Bulletin and other University publications. The magistrate judge focused on paragraph 60 of the complaint, which states, "The specific provisions of the Contract that are at issue in this action are" the Bulletin and other University publications. That allegation is arguably ambiguous as to whether the publications are themselves contracts or merely express terms of a contractual relationship. Paragraph 59, which the magistrate judge overlooked, makes clear that Giuliani alleges the latter: "Andrew agreed to, among other things[,] pay Duke University well in excess of $200,000 over four years, to allow the University to use his likeness in its solicitations and advertisements, and to abide by the rules established in the Contract. In exchange, Duke University promised to provide Andrew an array of educational services, the opportunity to participate in the University's intercollegiate golf program, and lifetime access to the University's 'state-of-the-art' golf training facilities."

Second, the magistrate judge's reliance upon *Love v. Duke University*, 776 F. Supp. 1070 (M.D.N.C. 1991), *aff'd*, No. 91-2263, 1992 U.S. App. LEXIS 5802 (4th Cir. Mar. 30, 1992) (per curiam), was misplaced. In that case, the court adverted to two grounds to justify its decision

11

that the University did not breach the terms of the Bulletin by dismissing Love from a graduate program after he had received two failing grades: (1) the court found that Love had not fulfilled a condition precedent to the University's obligation; and (2) consistent with *Ryan*'s reluctance to inquire into the nuances of educational processes and theories, the court thought that "great deference must be given to" the University's decision because "academic dismissals are wholly discretionary." 776 F. Supp. at 1075. To the extent that Giuliani has satisfied all relevant conditions precedent (an issue about which Amici express no view), *Love* does not support dismissal because, as just noted, none of the allegedly breached promises at issue relates to the University's academic policies or prerogatives.

Third, the magistrate judge analogized Giuliani's claim to an employee's claim that the employer was contractually bound by an employee handbook. Citing *Brewer v. Jefferson-Pilot Standard Life Ins. Co.*, 333 F. Supp. 2d 433, 439 (M.D.N.C. 2004), and *Johnson v. Mayo Yarns, Inc.*, 484 S.E.2d 840, 843 (N.C. Ct. App. 1997), the magistrate judge noted that "an employee handbook or policy manual does not create a legally binding contract between employer and employee unless the terms of the handbook are expressly incorporated into a separate employment contract." R&R at 5-6 (quotation marks omitted). The magistrate judge might have also cited *Mercer*—as Defendants have, *see* Br. in Supp. of Defs.' Mot. for J. on the Pleadings at 9-11—in which the court expressly relied upon this analogy to conclude that Duke was not contractually bound by the nondiscrimination policy stated in the Student Handbook. *See* No. 97-959, slip op. at 14-15. But the analogy between student and employee handbooks is false. The decisions addressing the enforceability of an employee handbook that were cited by the court in *Mercer* and by the magistrate judge here involved a claim that the employer terminated an employee in violation of rules specified in a handbook or elsewhere outside the primary

12

written employment contract or that the employee was "at-will" and thus not under any contract. In the employment context, the rule that an employee handbook is not enforceable unless expressly incorporated into the employment contract ensures that a unilaterally promulgated handbook does not disrupt the express agreement of the parties or an important default rule against which the parties are presumed to have acted. More specifically, if the parties' written employment contract specifies that the employer may terminate the employee only for cause pursuant to certain procedures, then basic principles of contract law dictate that a separate, unilaterally promulgated document may not vary that agreement. *See Black v. Western Carolina Univ.*, 426 S.E.2d 733, 736 (N.C. Ct. App. 1993). And if the parties have not reached such an express agreement, then North Carolina law provides the default rule: the employment relationship is "terminable by either party at will." *Griffin v. Housing Auth. of Durham*, 303 S.E.2d 200, 201 (N.C. Ct. App. 1983). Express incorporation of an employee handbook shows that the parties intended to alter the contract's terms or override this default rule of at-will employment. In contrast, in the context of the university-student relationship, as here, there is ordinarily no separate express agreement or default rule that would be disrupted by the enforcement of bulletins, catalogues, circulars, or similar school publications. In fact, as *Ross*, *Ryan*, and other decisions show, the specific terms of the Bulletin and other such documents are the very terms of the agreement that bind the University.

      Fourth, the magistrate judge reasoned that the Bulletin and other publications are not enforceable because they "have provisions allowing unilateral changes." R&R at 8. But in general, "[w]hile [the University] could disclaim the existence of a specific promise through the use of such a disclaimer, it could not unilaterally disclaim all contractual relations between the parties." *Gally*, 22 F. Supp. 2d at 206 n.7 (citation omitted); *see also Atria*, 142 Fed. Appx. at

13

255 (under Tennessee law, student handbook's terms enforceable as implied contract even though handbook stated that its policies "do not constitute a contract") (quotation marks omitted). In any event, even if the University could have reserved the right to modify any terms unilaterally, it did not do so in the Bulletin, which expressly reserves the right to change only matters relating to academics: "programs of study, academic requirements, teaching staff, the calendar, and other matters described herein." *Bulletin* at 2; c*f. Abbariao v. Hamline Univ. Sch. of L.*, 258 N.W.2d 108, 114 (Minn. 1977) ("all provisions within this bulletin are subject to change without notice") (quotation marks omitted); *Robinson v. Univ. of Miami*, 100 So. 2d 442, 443 (Fla. Dist. Ct. App. 1958) ("The University reserves the right to change any provision or requirement at any time within the student's term of residence.").[4] The reservation, therefore, is irrelevant insofar as Giuliani seeks to enforce the terms of the Bulletin because, as noted above, he does not challenge the University's conduct of academic matters. More importantly, Duke could not reasonably have expected that Giuliani would believe that the University could dispense entirely with such fundamental protections as those against harassment and procedural improprieties. No prospective student or parent would select a school that reserved the power to permit, let alone foster, the harassment of the student or to punish the student without affording him notice and a fair opportunity to contest the charges before a neutral arbiter. And even if Duke could have disclaimed a non-academic promise stated in the Bulletin and other University publications, it could not avoid the covenant of good faith and fair dealing.

Finally, the magistrate judge did not even address the validity of Giuliani's claim that Defendants breached promises made by Coach Myers during the course of recruiting Giuliani to

---

[4] Pursuant to the principle of *ejusdem generis*, the general term "other matters" should be understood to reach only matters of the same type as those specifically mentioned—i.e., academic matters, *see John L. Roper Lumber Co. v. Lawson*, 143 S.E. 847, 850 (N.C. 1928)— not to reach all matters discussed in the Bulletin.

14

attend Duke. Those promises could be enforceable even if terms stated in the Bulletin and other University publications were not contractually binding upon Defendants. Defendants have argued, "Playing an intercollegiate sport is a privilege, not a right." Br. in Supp. of Defs.' Mot. for J. on the Pleadings at 8. But Giuliani does not claim a right to be on the team; he claims only the right to have the opportunity to be on the team and the right to be deprived of that eligibility only under certain circumstances, which, he alleges, were not present.

## CONCLUSION

For the foregoing reasons, the Court should decline to adopt the magistrate judge's Report and Recommendation to the extent it depends upon the determination that there was no valid contract, and should hold that Defendants were bound by the terms stated in the Student Bulletin and other University publications, by promises made by Coach Myers in the course of recruiting Giuliani to attend Duke University, and by the covenant of good faith and fair dealing.

June 19, 2009

**THOMAS, FERGUSON & MULLINS, LLP**

/s/ William J. Thomas

William J. Thomas, II
(N.C. Bar # 9004)
thomas@tfmattorneys.com
119 East Main Street
Durham, NC 27701
919-682-5648

Respectfully submitted,

**COOPER & KIRK, PLLC**

/s/ Charles J. Cooper
Charles J. Cooper
ccooper@cooperkirk.com
David H. Thompson
 (N.C. Bar # 31958)
dthompson@cooperkirk.com
David Lehn
dlehn@cooperkirk.com
1523 New Hampshire Avenue NW
Washington, DC 20036
202-220-9600

***Attorneys for Amici Edward C. Carrington* et al.**

15

**CERTIFICATE OF SERVICE**

      I hereby certify that, on June 19, 2009, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of the filing to the following:

James Donald Cowan, Jr.
ELLIS & WINTERS, LLP
100 North Greene Street, Suite 102
Greensboro, NC 27401
*Counsel for Defendants Duke University and Orrin Daniel Vincent, III*

Robert C. Ekstrand
EKSTRAND & EKSTRAND, LLP
811 Ninth St., Suite 260
Durham, North Carolina 27705
*Counsel for Plaintiff Andrew Guliani*

                                                /s/David Lehn