IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

```
                           )
ANDREW GIULIANI            )
                           )
     Plaintiff,            )
                           )
     v.                    )        1:08CV502
                           )
DUKE UNIVERSITY, and       )
ORRIN DANIEL VINCENT III   )
                           )
     Defendants.           )
```

## MEMORANDUM OPINION AND ORDER

OSTEEN, JR., District Judge.

Presently before the court is Defendants' Motion for Judgment on the Pleadings (Doc. 10).  On May 19, 2009, the United States Magistrate Judge issued a Memorandum Opinion, Recommendation, and Order recommending to this court that Defendants' Motion for Judgment on the Pleadings be granted. (Doc. 23.)  Plaintiff filed timely objections.  (Doc. 27.)  After the Magistrate Judge issued his recommendation, Edward C. Carrington et al. filed a Motion to Appear as Amici and for Leave to File Brief in Support of Plaintiff's Objections to the Magistrate Judge's Report and Recommendations.  (Doc. 29.)

This court has reviewed de novo the motion to dismiss, the report of the Magistrate Judge, and all related pleadings.  This court has also reviewed the motion to appear as amici.  For the reasons set forth herein, Defendants' Motion for Judgment on the Pleadings (Doc. 10) will be granted, and this action will be

dismissed with prejudice.  The Motion to Appear as Amici and for Leave to File Brief (Doc. 29) will be denied.

## I.    Background

The following facts are presented in the light most favorable to Plaintiff Andrew Giuliani ("Mr. Giuliani" or "Plaintiff") as alleged in the complaint.  Plaintiff is suing Duke University ("Duke") and current Head Golf Coach O. D. Vincent ("Coach Vincent") (collectively, "Defendants") for breach of contract, breach of the covenant of good faith and fair dealing, and tortious interference with contract.  Plaintiff also has asserted claims against Duke alone for promissory estoppel and for declaratory relief.

While he was a junior in high school, Mr. Giuliani was recruited to play varsity golf at Duke University by then Head Coach Rod Myers ("Coach Myers").  (Compl. (Doc. 1) ¶ 11.)  In recruiting Mr. Giuliani, Coach Myers emphasized that Plaintiff would be given "life-time access" to Duke's "state-of-the-art" training facilities as an alumnus of the Duke Golf Program, as well as "have the opportunity to compete with his teammates to earn spots in the most competitive tournaments against the most talented players in the NCAA."  (Id. ¶ 13.)  Mr. Giuliani alleges that these inducements were material to his decision to enroll at Duke.  (Id. ¶ 14.)  Plaintiff alleges that in exchange for roughly $200,000.00 in tuition and fees, as well as foregoing

2

numerous opportunities at other colleges and universities, Duke "promised to provide [Mr. Giuliani] with various educational services, lodging, and a right of access to the Athletic Department's Varsity program and facilities." (<u>Id.</u> ¶ 15.)

In the spring of 2007, Coach Myers unexpectedly passed away, and Coach Vincent took over the golf program in the summer of 2007. (<u>Id.</u> ¶¶ 3, 14, 17.) Coach Vincent sought to cut the size of the golf squad in half, and on February 11, 2008, Coach Vincent "announced to the team that he was unilaterally cancelling [Mr. Giuliani's] eligibility to participate in the University's Athletics Program immediately and indefinitely." (<u>Id.</u> ¶ 18.) In support of his decision to suspend Mr. Giuliani, Coach Vincent cited several incidents involving Mr. Giuliani that allegedly occurred in early February. (<u>Id.</u> ¶ 19.) Coach Vincent indicated that Mr. Giuliani's suspension would become permanent unless all twelve of his teammates wrote a letter supporting his reinstatement to the team. (<u>Id.</u> ¶ 20.) Mr. Giuliani alleges that his teammates generally supported his return to the team, but that Coach Vincent instructed players to "back off" and "was instilling new fears in his teammates that their positions on next year's roster were also in jeopardy." (<u>Id.</u> ¶¶ 26-32.)

In late March 2007, Coach Vincent told Mr. Giuliani that he would also have to participate in a "qualifier" to maintain his status as a member of the men's golf team for the 2008-2009

3

season; however, Coach Vincent had indicated earlier that those who participated as a member of the varsity team in a 2007-2008 tournament — as Mr. Giuliani did — had already qualified for the team. (Id. ¶¶ 33-34.) Nevertheless, Coach Vincent indicated that if Mr. Giuliani agreed to certain "parameters," he would not have to re-qualify. (Id. ¶ 34.) Specifically, Coach Vincent presented Mr. Giuliani with a written agreement laying out the steps that must be taken in order for Mr. Giuliani to become a member of the golf team again. (Id. ¶ 36, Ex. 1.) Mr. Giuliani repeatedly refused to sign the document. (Id. ¶ 42.) As a result, Mr. Giuliani alleges that Coach Vincent retaliated against him by revoking his parking privileges at the Athletic Department's facilities and prohibiting him from using the Duke golf facilities, and that such actions were taken without Coach Vincent informing Mr. Giuliani that his eligibility had been terminated. (Id. ¶ 43-44.)

Mr. Giuliani alleges that his attempts to have the matter investigated by Duke officials were shut down and that Deputy General Counsel Kate Hendricks' investigation was "a sham." (Id. ¶¶ 45-51.) Duke University's General Counsel, Pamela Bernard, issued an opinion letter claiming that Coach Vincent's termination of Mr. Giuliani's eligibility was "within the significant authority of the coach" and insisting that Mr. Giuliani's "only option was to pursue a grievance procedure

4

conducted by an administrator who must defer to Bernard on such questions." (Id. ¶¶ 48-52.) Consequently, Mr. Giuliani alleges that "Bernard's Opinion thereby vitiated any meaningful administrative remedy that theoretically could have been available to Andrew in the grievance procedure she directed Andrew to pursue." (Id. ¶¶ 52-54.) These allegations suggest a reasonable inference that Mr. Giuliani did not pursue the administrative remedy offered in Ms. Bernard's opinion letter.

In July 2008 Mr. Giuliani initiated this lawsuit in the United States District Court for the Middle District of North Carolina. After filing an answer, Defendants moved for judgment on the pleadings in September 2008. (Doc. 10.) The United States Magistrate Judge addressed the motion for judgment on the pleadings by way of recommendation in which he recommended that Defendants' motion for judgment on the pleadings be granted on the ground that Plaintiff failed to establish the elements of a breach of contract claim. (Doc. 23.) Plaintiff filed timely objections to the recommendation. (Doc. 27.)

Soon after Plaintiff filed his objections, Edward C. Carrington et al. filed a motion to appear as amici (Doc. 29), as well as a brief in support of Plaintiff's objections to the Magistrate Judge's Recommendation (Doc. 30). Plaintiff consented to the motion, but Defendants have opposed the motion. (Doc. 32.)

## II.  **Legal Standard**

In a diversity action, a district court applies the applicable state substantive law and federal law governs the procedural issues.  Dixon v. Edwards, 290 F.3d 699, 710 (4th Cir. 2000).  Although the court's evaluation of a 12(c) motion is not limited to the plaintiff's complaint and the court may consider all relevant pleadings, the same standard is applied in evaluating motions under Federal Rule of Civil Procedure 12(c) as for motions to dismiss pursuant to Rule 12(b)(6).  Independence News, Inc. v. City of Charlotte, 568 F.3d 148, 154 (4th Cir. 2009) (citing Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, ___ U.S. ___, ___, 129 S.Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  In Iqbal the Supreme Court explained that motions to dismiss should be considered using a "two-pronged approach."  See Iqbal, ___ U.S. at ___, 129 S.Ct. at 1950.  First, a court must accept as true all factual allegations contained in a complaint.  Id. at 1949.  However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Id. at 1950.  "The tenet that a court must accept as true all of

6

the allegations contained in a complaint is inapplicable to legal conclusions." Id. at 1949.[1]  Courts should therefore "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." Id. at 1950.

Once a court assumes the veracity of well-pleaded factual allegations, it should "then determine whether they plausibly give rise to an entitlement to relief." Id.  In order for a claim to be facially plausible, a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable" and must demonstrate "more than a sheer possibility that a defendant has acted unlawfully." Id. at 1949 (citing Twombly, 550 U.S. at 556).  Whether a complaint states a plausible claim for relief will "be a context-specific task that requires the reviewing court to draw on its judicial experience

_____

[1]Thus, this court is not bound by legal conclusions such as "the University is bound to the same law of contract . . . that every party to a contract in North Carolina is bound." (Compl. (Doc. 1) at 1.) Similarly, a court is not required to accept as true an allegation that a contract or agreement existed unless sufficient facts are alleged to support such a finding. See, e.g., Brown v. Rectors & Vistors of the Univ. of Va., No. 3:07-cv-30-nkm-bwc, 2010 U.S. App. LEXIS 1013 (4th Cir. Jan. 19, 2010)("Brown also argues that the district court erred in finding that the Graduate Student Handbook referenced in the complaint did not constitute a contract between himself and UVA as a matter of law.  The district court did not err because Brown's complaint contained only conclusory allegations that the Graduate Student Handbook constituted a contract between himself and UVA, and that assertion was unsupported by the terms of the Handbook . . . ."(emphasis added)).

7

and common sense." <u>Id.</u> at 1950. However, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but has not 'show[n]' — 'that the pleader is entitled to relief.'" <u>Id.</u> (<u>citing</u> Fed. R. Civ. P. 8(a)(2)).

## III. Analysis

### A. <u>Motion to Appear as Amici in Support of Plaintiff's Objections to the Magistrate Judge's Recommendation</u>

This court will first address the motion of Edward C. Carrington et al., who seek to appear as amici and to file a brief in support of Plaintiff's objections. (Doc. 29.) Amici are current members of the Duke lacrosse team and have filed a separate complaint against Duke. <u>See</u> <u>Compl.</u>, <u>Carrington v. Duke Univ.</u>, 1:08CV119 (M.D.N.C., Feb. 21, 2008). They have asserted a number of counts against Duke, one of which they allege is pertinent to this case.

Specifically, amici argue in their motion that they have a significant interest in the outcome of this case because their complaint, like Mr. Giuliani's, alleges that Duke was contractually bound by terms set forth in the Student Bulletin and other university publications, by statements a coach made to them as an inducement to enroll at Duke, and by the covenant of good faith and fair dealing. (Amici Br. in Supp. of Pl.'s Objections (Doc. 30) at 2.) "Amici believe their brief will assist the Court

8

in resolving the pending motion for judgment on the pleadings in this case by providing the Court with additional analysis of the key legal issue — whether Defendants were subject to any contractual obligations — beyond what Giuliani provides the Court in his brief." (Id.)

Although there is no Federal Rule of Civil Procedure that applies to motions for leave to appear as amicus curiae in a federal district court, Rule 29 of the Federal Rules of Appellate Procedure applies to amicus briefs at the federal appeals level. That rule indicates that amici should state "the reason why an amicus brief is desirable and why the matters asserted are relevant to the disposition of the case." Fed. R. App. P. 29(b)(2).

After reviewing the brief filed by amici, this court concludes that their motion for leave to appear should be denied. The mere fact that amici have similar claims pending before another court in this district does not entitle them to appear in the present lawsuit. Amici's interests are adequately protected by their right to present their claims for independent review by a separate court, one which is not bound by any finding or holding of this court.

Plaintiff's interests in this case have been adequately presented and defended by counsel. Amici's brief makes generally the same arguments and cites to many of the same cases that

9

Plaintiff presented in his objections. One notable exception is amici's "implied-in-fact" argument, as Plaintiff has not advanced a separate claim for relief based upon an "implied-in-fact" contract.[2] Specifically, amici argue that "a contract may be formed in fact when the student agrees to pay tuition and fees and to abide by the rules . . . in exchange for the opportunity to take classes, participate in activities, and obtain a degree, as well as for the school's promise to adhere to the terms stated in the bulletin and other university publications." (See Amici Br. in Supp. of Pl.'s Objections (Doc. 30) at 8.) Nevertheless, this court concludes that this argument, in the manner relevant to this case, has been adequately advanced by Plaintiff. See supra note 2; infra note 9. Amici do not present any unique perspective on their position that Duke was contractually bound by terms set forth in the Student Bulletin and other university publications.

_____

[2]This court does note that Plaintiff appears to suggest in his objections that a theory of "implied-in-fact" contract is applicable. (See Pl.'s Objections (Doc. 27) at 3 n.2.) Although not specifically set out as a claim, such a theory is a consideration in determining whether a motion to amend would be futile. This court finds that it would not be permissible to find an implied contract on the facts of this case. As set forth in the analysis hereinafter, this court finds that under North Carolina law, the university publications are not a part of any legally enforceable rights acquired by contract in the facts of this case, and North Carolina courts will only enforce a specific, identifiable provision of a publication that has been specifically incorporated into a contract. See infra Section II.B.2. Therefore, a theory of an implied-in-fact contract is contrary to this court's interpretation of North Carolina law. See also infra note 9 (discussing Plaintiff's argument as to an implied-in-fact contract).

Accordingly, Plaintiff's interests are adequately represented by counsel in the present case and amici's motion will be denied.

B.  **Plaintiff's Objections to the Magistrate Judge's Recommendation and Report**

Plaintiff objects to "each and every one" of the Magistrate Judge's dispositive recommendations.[3] (Pl.'s Objections (Doc. 27) at 1.) In ruling on Defendant's motion to dismiss, this court will address arguments within the context of Plaintiff's specific claims as set forth hereafter.

1.  **Contractual Nature of Statements Made by Coach Myers**

In order to establish a claim for breach of a legally enforceable contract, Plaintiff argues in part that Coach Myers' oral recruiting statements are contractual terms "binding on Duke by operation of ordinary principles of contract law . . . ." (Pl.'s Objections (Doc. 27) at 3.) Specifically, Plaintiff alleges that Coach Myers' recruiting offer included an opportunity to compete, a promise of a right of access to the Athletic Department's programs and facilities while Plaintiff was a student, and life-time access to Duke's training facilities. (Id. at 4-5.) In exchange, Plaintiff asserts that he promised to pay Duke in excess of $200,000.00, to grant Duke the right to use his

_____

[3] Plaintiff has not objected to the Magistrate Judge's determination that North Carolina law applies to his claims, and neither side appears to contest that fact. This court also concludes that North Carolina law applies to this case.

11

name and likeness in its promotional materials, and to forego opportunities at other universities. (<u>Id.</u> at 5.) Plaintiff contends that when he enrolled at Duke, the recruiting offer was converted into a binding promise enforceable under North Carolina law "by operation of a century-old, 'central principle' of contract law." (<u>Id.</u>)

Defendants, on the other hand, argue that Plaintiff has not alleged facts in his complaint that establish the elements of an oral agreement between Coach Myers (on behalf of Duke) and Mr. Giuliani. They point to the fact that in his complaint, Plaintiff identifies four <u>documents</u>[4] — not the oral communications between Coach Myers and himself — as "[t]he specific provisions of the Contract that are at issue in this action . . . ." (Compl. (Doc. 1) ¶ 60.) It is only in the Brief in Opposition to Defendant's Motion for Judgment on the Pleadings that Plaintiff argues that he "is not alleging that the [documents] themselves are the Contract, but that elements of the Contract are evinced in the documents which contain, among other things, the terms of the agreement, including the amount of tuition and due process guarantees." (Pl.'s Br. in Opp. to Defs.' Mot. (Doc. 14) at 10; <u>see also</u> Pl.'s Objections (Doc. 27) at 3 ("The Recommendation's most

_____

[4] These four documents are the Duke University Student-Athlete Handbook (Compl. (Doc. 1) Ex. 5), the Duke University Athletic Department Policy Manual (<u>id.</u> Ex. 6), the Duke University Student Bulletin (<u>id.</u> Ex. 7), and the 2007-2008 NCAA Division I Manual (Constitution and By-Laws) (<u>id.</u> Ex. 8).

consequential error is its failure to identify the contractual terms that are not contained in the policy manuals annexed to the Complaint.").)

Plaintiff responds that he has sufficiently identified the terms of the alleged oral agreement in the complaint. (Reply in Supp. of Pl.'s Objections (Doc. 33) at 1.) He points to paragraph fifty-nine, which reads in its entirety:

> 59. Pursuant to the Contract, Andrew agreed to, among other things: pay Duke University well in excess of $200,000 over four years, to allow the University to use his likeness in its solicitations and advertisements, and to abide by the rules established in the Contract. In exchange, Duke University promised to provide Andrew an array of educational services, the opportunity to participate in the University's intercollegiate golf program, and lifetime access to the University's "state-of-the-art" golf training facilities.

(Compl. (Doc. 1) ¶ 59.) The complaint also alleges at paragraph fourteen that "Andrew decided to accept Duke University's offer to enroll based in material part upon the promises that the University made to him through Coach Myers." (Id. ¶ 14.)

A valid contract is formed when two parties manifest an intent to be bound. Parker v. Glosson, 182 N.C.App. 229, 232, 641 S.E.2d 735, 737 (2007) (citing Croom v. Goldsboro Lumber Co., 182 N.C. 217, 220, 108 S.E. 735, 737 (1921)). A contract does not exist if "one party simply believes that a contract exists, but there is no meeting of the minds." Elliott v. Duke Univ., 66 N.C.App. 590, 595, 311 S.E.2d 632, 636 (1984) (citing Brown v.

13

<u>Williams</u>, 196 N.C. 247, 145 S.E. 233 (1928)). Furthermore, the terms of a contract must be "definite and certain or capable of being made so" such that the parties "assent to the same thing, in the same sense." <u>Horton v. Humble Oil & Refining Co.</u>, 255 N.C. 675, 679, 122 S.E.2d 716, 719 (1961) (internal quotation marks and citations omitted).

This court finds that Plaintiff's claim for breach of contract based on Coach Myers' oral statements does not meet the pleading requirements of <u>Iqbal</u> because the statements do not show a meeting of the minds, <u>see</u> <u>Elliott</u>, 66 N.C.App. at 595, 311 S.E.2d at 636, nor do they establish definite and certain terms, <u>see</u> <u>Horton</u>, 255 N.C. at 679, 122 S.E.2d at 719. Rather than manifesting an intent to be bound, Coach Myers' statements to Mr. Giuliani describe the potential benefits available if Mr. Giuliani enrolled at Duke, earned a spot on the golf team, and maintained that spot on the team. The statements are, at best, ambiguous as to the circumstances under which Mr. Giuliani would acquire any rights. The statement regarding inclusion in tournaments is framed as an "opportunity to . . . earn spots" to compete, and the statement regarding life-time access is conditioned on Mr. Giuliani being an "alumnus of the Duke Golf Program." (Compl. (Doc. 1) at ¶ 13.) These statements are not certain and definite as to what constitutes an "opportunity" or how one may become an "alumnus of the Duke Golf Program." For instance, Coach Myers'

14

description of "opportunity" can plausibly be understood to have been fulfilled simply by the fact that Plaintiff attended Duke and tried out for the team at some time, which is the same "opportunity" available to any other student. The statement does not promise unconditional and unlimited opportunities to be on the golf team. The statement regarding life-time access to the facilities is also indefinite and uncertain about what theoretical rights Mr Giuliani could obtain. Specifically, the statement is unclear as to whether Mr. Giuliani would become an alumnus once he spent any amount of time playing on the team or if he had to play for the team during his entire time as a student to qualify as an alumnus.

Furthermore, even contractual athletic scholarships do not ensure a student's right to play a sport but only constitute a promise by the university to provide the student with financial assistance in exchange for the student's maintenance of athletic eligibility. See Jackson v. Drake Univ., 778 F.Supp. 1490, 1493 (S.D. Iowa 1991) (holding that even when a student is receiving a contractual athletic scholarship, such "financial aid agreements do not implicitly contain a right to play basketball"); see also Taylor v. Wake Forest, 16 N.C.App. 117, 121, 119 S.E.2d 379, 382 (1972) (holding that the university rather than the student recipient of a football scholarship had the right to determine whether the student was maintaining academic eligibility).

15

Therefore, it is "implausible," as defined by <u>Iqbal</u>, to suggest that Coach Myers' acknowledgement of an "opportunity to compete," even coupled with a suggestion of "life-time access" could confer an absolute right of participation greater than that of a student with an athletic scholarship.  For the foregoing reasons, this court concludes that the alleged representations of Coach Myers do not create an enforceable contract as alleged by Plaintiff.

### 2.  Contractual Nature of Duke's Policy Manuals

In addition to Coach Myers' alleged statements, Plaintiff argues that the provisions of the university's policy manuals (the "four documents" (Compl. (Doc. 1) ¶¶ 16, 60)) are enforceable as "binding contracts."  (Pl.'s Objections (Doc. 27) at 7.) Plaintiff specifically alleges that the relevant agreement between Plaintiff and the University "is memorialized in several documents that govern the dimensions of the relationship . . . ."  (Compl. (Doc. 1) ¶ 16.)  Collectively, the documents are referred to by Plaintiff as "'the Contract.'"[5] (<u>Id.</u>)  Plaintiff further contends that "the Contract" created legally enforceable rights which have been breached by Defendants.  (<u>Id.</u> ¶¶ 61-77.)

This court, sitting in diversity jurisdiction, "has a duty to apply the operative state law as would the highest court of the state in which the suit was brought."  <u>Liberty Mut. Ins. Co. v.</u>

_____

[5] Although Plaintiff has entitled the documents collectively as "the Contract," this court is not bound by legal conclusions. <u>See</u> <u>supra</u> Section II.

<u>Triangle Indus.</u>, 957 F.2d 1153, 1156 (4th Cir. 1992). If the state's highest court has not addressed an issue, then a "state's intermediate appellate court decisions constitute the next best indicia of what state law is although such decisions may be disregarded if the federal court is convinced by other persuasive data that the highest court of the state would decide otherwise." <u>Id.</u> (internal quotation marks and citation omitted). The Supreme Court of North Carolina has not directly addressed the question of what terms or publications constitute an agreement between a student and a university under North Carolina law. Plaintiff argues that the North Carolina Court of Appeals' holding and reasoning in <u>Ryan v. Univ. N.C. Hosp.</u>, 128 N.C.App. 300, 494 S.E.2d 789 (1998), and the Seventh Circuit's holding in <u>Ross v. Creighton Univ.</u>, 957 F.2d 410 (7th Cir. 1992), as cited by <u>Ryan</u>, set forth the applicable analysis and should control in this case. (Pl.'s Objections (Doc. 27) at 8-9.) Defendants argue that <u>Mercer v. Duke Univ.</u>, 1:97CV959 (M.D.N.C., Sept. 28, 2000), and <u>Love v. Duke Univ.</u>, 776 F.Supp. 1070 (M.D.N.C. 1991), <u>aff'd</u>, 959 F.2d 231 (4th Cir. 1992) (unpublished table opinion), set forth the proper analysis and, pursuant to the reasoning in those cases, Plaintiff's complaint should be dismissed. (Def.'s Resp. to Pl.'s Objections (Doc. 31) at 9-11.)

In <u>Ryan</u>, relied on by Plaintiff, the plaintiff was a medical resident and hospital employee with a written employment contract

17

that required the University to provide a training program that
complied with the policies of the Accreditation Council for
Graduate Medical Education Residency Review Committee. Ryan, 128
N.C.App. at 301, 494 S.E.2d at 790. The Ryan court refused to
interfere with the subjective "nuances" of the educational process
but did permit a narrow claim that alleged a specific,
identifiable provision (an ob/gyn rotation) of the contract that
the university failed to provide. Id., 128 N.C.App. at 302, 494
S.E.2d at 791. Rather than holding that all educational handbooks
are enforceable contracts, the Ryan court simply permitted an
action to proceed based on an identifiable contractual provision
specifically incorporated into an agreement that addressed both
employment and medical residency. Because Mr. Giuliani has not
alleged the existence of a contract specifically incorporating the
student handbooks or their terms, Ryan does not apply.

In Mercer, decided after Ryan, another judge of this court
addressed the issue of whether student handbooks are "part of the
contract between the school and [the plaintiff] under North
Carolina law." Mercer, No. 1:97CV959, slip op. at 14. In Mercer,
as in this case, the plaintiff did not present a contract that
specifically incorporated the terms of the student handbooks. The
Mercer court cited Ryan and "recognized 'that a student can bring
an action for breach of contract arising from a dispute related to
an educational contract.'" Id. at 13. However, the court in

18

<u>Mercer</u> addressed the issue that was not decided in <u>Ryan</u> — whether the university publications are part of the contract between the school and a student under North Carolina law. <u>Id.</u> at 14. The <u>Mercer</u> court analyzed the issue by reference to North Carolina law regarding whether employee handbooks are part of the contract between employer and employee. <u>Id.</u> at 14-15. As the judge in <u>Mercer</u> found, employee handbooks are part of the contract between employer and employee only when they are explicitly included by reference in the employee contract. <u>Id.</u> (<u>citing</u> <u>Black v. Western Carolina Univ.</u>, 109 N.C.App. 209, 213, 426 S.E.2d 733, 736 (1993)). The court in <u>Mercer</u> concluded that a student's claim alleging a contract based on the terms in student handbooks that have not been explicitly included or incorporated into a contract must be dismissed. <u>Id.</u> at 15.

   Although Plaintiff has alleged the statements of Coach Myers and the existence of the handbooks, Plaintiff has not produced or alleged a contract specifically incorporating Duke's handbooks and policy manuals into a contract. This court therefore finds <u>Mercer</u> and <u>Love</u>[6] persuasive, and, under North Carolina law, in the absence of a contract between Plaintiff and Duke University expressly incorporating the student handbooks and related

---

   [6] <u>Love</u>, which was decided before <u>Mercer</u>, reaches the same conclusion as <u>Mercer</u>. <u>See</u> <u>Love</u> 776 F.Supp. at 1075 (stating that "the academic bulletin is not a binding contract" between a school and its students).

documents, Plaintiff's breach of contract claim should be dismissed.[7]  Accordingly, this court finds that Plaintiff's complaint does not show the existence or breach of a legally enforceable contract by means of either the alleged oral statements made by Coach Myers or the student handbooks.[8]

### 3. Plaintiff's Claim for Declaratory Relief

Plaintiff also objects to the entry of a judgment of dismissal on Plaintiff's claim for declaratory relief.  (Pl.'s Objections (Doc. 27) at 17.)  Plaintiff argues that the existence of a valid contract is not a precondition to declaratory relief.

---

[7] Even assuming, _arguendo_, that the handbooks and manuals have some effect on the relationship between Plaintiff and Defendants, the manuals in their entirety do not support Plaintiff's claims.  For example, Plaintiff contends that it was a violation of the "Standards of Behavior" (Compl. (Doc. 1) Ex. 5 at 13) for Coach Vincent to suspend Plaintiff without consulting the Director of Athletics.  (Compl. (Doc. 1) ¶ 66.)  The "Standards of Behavior" identify certain rules which, if violated, may result in suspension after consultation with the Director of Athletics. (See Compl. (Doc. 1) Ex. 5 at 13.) However, the introductory section of the "Standards of Behavior" states that "individual teams are free to develop their own team rules." _Id._  Thus, the team has broad discretion to create its own rules which, presumably, could result in the removal of some players regardless of whether they complied with the other rules in the handbook.  The university publications do not require consultation with the Director of Athletics with respect to the enforcement of individual team rules.

[8] Plaintiff's claim is based on a theory that he acquired certain legally enforceable contractual rights by means of Coach Myers' oral statements in combination with the university publications, and that limited issue is the matter addressed in this opinion.  This court is not addressing any other issues related to the nature of the relationship between a student and a university under North Carolina law.

20

(Id. at 18-19.)  Additionally, Plaintiff asserts that Shelton v.
Duke Univ. Health Sys.,Inc., 179 N.C.App. 120, 663 S.E.2d 113
(2006), contradicts the Recommendation since the case finds
declaratory judgment improper after holding that a valid contract
did exist.  Id. 179 N.C.App. at 125, 663 S.E.2d at 117.  This
court finds that because there is no legally enforceable contract
between the parties, dismissal of the declaratory judgment action
is proper.

    The purpose of declaratory judgment is to clarify any
uncertainty about legal relations.  Centennial Life Ins. Co. v.
Poston, 88 F.3d 255, 256 (4th Cir. 1996) (quoting Aetna Cas. &
Sur. Co. v. Quarles, 92 F.2d 321, 325 (4th Cir. 1937).  The
decision to grant declaratory judgment is discretionary with the
court.  Id.  If a declaratory judgment will not clarify or settle
an uncertainty in legal relations, the court should decline to
grant it.  Quarles 92 F.2d at 325 (quoting Edwin M. Borchard,
Declaratory Judgments 107-09 (1934)).  Therefore, if a case is
settled by the decision that a valid contract does not exist,
declaratory judgment would be improper since the decision about
the contract removes any uncertainty about the parties'
relationship.  This is true not because of the actual holding that
a contract does or does not exist, but because the effect of the
holding removes the need for a declaratory judgment.  In Shelton,
the court determined that declaratory judgment was inappropriate

21

since the controversy was settled by its determination that a
valid contract existed.  Shelton, 179 N.C.App. at 125, 663 S.E.2d
at 117.  Likewise, in the present case, the controversy is settled
by the court's determination that Plaintiff did not acquire
legally enforceable rights by contract under North Carolina law.
Therefore, declaratory judgment would be improper.

### C. **Plaintiff's Remaining Claims**

Plaintiff's remaining claims are 1) breach of the implied
covenant of good faith and fair dealing; 2) tortious interference
with contract; and 3) promissory estoppel.  Each of these
remaining claims will be dismissed for the reasons that follow.

### 1. **Breach of Implied Covenant of Good Faith and Fair Dealing**

All parties to an enforceable contract must act under the
implied covenant of good faith and fair dealing.  Maglione v.
Aegis Family Health Ctrs., 168 N.C.App. 49, 56, 607 S.E.2d 286,
291 (2005) (quoting Weyerhaeuser Co. v. Godwin Bldg. Supply Co.,
40 N.C.App. 743, 746, 253 S.E.2d 625, 627 (1979)).  In the absence
of an enforceable contract, the parties cannot have an implied
covenant of good faith and fair dealing.  Since this court holds
that no enforceable contract exists, Plaintiff's claim for breach
of the implied covenant of good faith and fair dealing should be
dismissed.

22

## 2. Tortious Interference with Contract

A claim for tortious interference with contract requires the existence of a valid contract.  United Labs., Inc. v. Kuykendall, 322 N.C. 643, 661, 370 S.E.2d 375, 387 (1988).  Since there is not an enforceable contract in this case, Plaintiff's claim for tortious interference with contract should be dismissed.

## 3. Promissory Estoppel[9]

North Carolina does not recognize the affirmative use of promissory estoppel to substitute for a missing element of a contract.  See Dealers Supply Co. v. Cheil Indus., 348 F.Supp.2d 579, 587 (M.D.N.C. 2004) (citing Home Elec. Co. of Lenoir, Inc. v. Hall & Underdown Heating & Air Conditioning Co., 86 N.C.App. 540, 544-45, 358 S.E.2d 539, 542 (1987)).  Since Plaintiff's use of

---

[9]Plaintiff does not specifically mention promissory estoppel anywhere other than his complaint.  Instead, he appears to assert in later pleadings that a claim for "quasi or implied contract" should be permitted to substitute for his claim for promissory estoppel.  (Pl.'s Opp'n Def.'s Mot. J. on the Pleadings (Doc. 14) at 13-14; Pl.'s Objections (Doc. 27) at 3 n.2 (referring to "breach of contract implied-in-fact").)  The cases Plaintiff cites for this proposition do not hold that a non-binding student manual can form the basis of a quasi or implied contract. Instead, the cases are examples of jurisdictions where, unlike North Carolina, policy manuals are considered binding contracts. (Pl.'s Opp'n Def.'s Mot. J. on the Pleadings (Doc. 14) at 14 (citing Havlik v. Johnson & Wales Univ., 509 F.3d 25, 35 (1st Cir. 2007); Fellheimer v. Middlebury Coll., 869 F.Supp. 238, 242 (D. Vt. 1994); Babiker v. Ross Univ. Sch. of Med., No. 98 CIV 1429 THK, 2000 WL 666342, at *6 (S.D.N.Y., May 19, 2000); Carr v. St. John's Univ., 231 N.Y.S.2d 410, 413-14 (N.Y. App. Div. 1962).)  Therefore, Plaintiff's argument is without merit under North Carolina law.

23

promissory estoppel would substitute for an otherwise non-existent contract, the claim should be dismissed.

     **D.**   **Plaintiff's Request for Leave to Amend**

Plaintiff requests for leave to amend under Rule 15(a)(2) of the Federal Rules of Civil Procedure "[t]o the extent that Plaintiff's allegations are deemed insufficient with respect to any of the claims asserted in the Complaint . . . ."  (Pl.'s Objections (Doc. 27) at 19-20.)  Although leave to amend is ordinarily freely given, it may be denied if such an amendment would be futile.  <u>Davis v. Piper Aircraft Corp.</u>, 615 F.2d 606, 613 (4th Cir. 1980).  In the present case, Plaintiff has not forecast any facts which, if alleged in the complaint, would be sufficient to support a finding that an enforceable contract exists.  Therefore, Plaintiff's request for leave to amend is hereby denied.

## IV. Conclusion

It is therefore **ORDERED** that the Motion to Appear as Amici and for Leave to File Brief (Doc. 29) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendants' Motion for Judgment on the Pleadings (Doc. 10) is **GRANTED**, and Plaintiff's claims for breach of contract, breach of implied covenant of good faith and fair dealing, tortious interference with contract, declaratory relief, and promissory estoppel are **DISMISSED**.

24

**IT IS FURTHER ORDERED** that Plaintiff's request for leave to amend is **DENIED.** A Judgment dismissing this action will be entered contemporaneously with this Order.

This the 30th day of March 2010.

_____     William L. Osteen, Jr.
                            United States District Judge